**TEXAS PIPE LINE CO. v. HUNT et ux.**

No. 14008.

Court of Civil Appeals of Texas. Dallas.

June 10, 1949.

Rehearing Denied July 8, 1949.

Wm. N. Sands, Fort Worth, for appellant.

Willis & Lewis, Dallas, for appellees.

CRAMER, Justice.

The evidence in this case, although voluminous, is not difficult or involved. Appellant sought to condemn for pipe line purposes a strip of land 35 feet wide (17½ feet on each side of a center line, equaling 1.342 acres). When the case regularly reached the county court for trial the jury, under instruction and issues (the form and substance of which are not complained of on this appeal), returned as their verdict the following answers to special issues:

(1) "What do you find from a preponderance of the evidence was the reasonable market value of the 1.342-acre strip of land covered by the right-of-way or easement involved herein, immediately prior to the taking of said easement?" Answer "$1073.60." (2) "What do you find from a preponderance of the evidence was the reasonable market value of the 1.342-acre strip of land covered by the right-of-way or easement involved herein, immediately after the taking of said easement?" Answer "0.00—No value." (3) "What do you find from a preponderance of the evidence was the reasonable market value of the 185 acres in the James McLaughlin Survey in evidence herein, exclusive of the 1.342-acre strip of land covered by the easement, and the 55 acres out of the Archer Survey adjoining the McLaughlin Survey, immediately before the taking of the easement involved herein?" Answer "180,000." (4) "What do you find from a preponderance of the evidence was the reasonable market value of the 185 acres in the James McLaughlin Survey in evidence herein, exclusive of the 1.342-acre strip of land covered by the easement, and the 55 acres out of the Archer Survey, adjoining the McLaughlin Survey, immediately after the taking of the easement involved herein?" Answer "$165,000."

Appellant assigns eleven points of error, in substance as follows: (1) The acquisition of the easement over and across the 35-foot strip of land for the construction of a pipe line did not constitute such a taking as to entitle appellees to recover as damages the full reasonable market value of the strip of land at the time the easement was acquired; (2) the jury's finding to issue No. 2 of no value to the strip of land after the taking of the right-of-way or easement is without any evidence to support it; (3) the jury's answer to issue No. 2 is contrary to the great weight and overwhelming preponderance of the evidence; (4) the location of said pipe line on the 35-foot strip of land neither caused any damage to nor interfered with appellees' legal rights, use, or enjoyment of the remainder of the land and the court erred in submitting to the jury issues 3 and 4 as to such damage; (5) that the jury's answer to issue 4 is without support in the evidence and (6) is against the great weight and overwhelming preponderance of the evidence; (7) error in submitting the 55 acres of land in the Archer Survey adjoining the McLaughlin Survey in issues 3 and 4 over appellants' objections; (8) the verdict is so palpably and manifestly excessive as to shock the sense of justice; (9) excluding the testimony of R. H. Gamble relating to the acquisition of another and different pipe line by the Humble Pipe Line Company over another part of the land involved; (10) excluding evidence of the witness Gamble relating to the name of an industrial concern negotiating with him for the purchase of a part of the land involved in this suit; and (11) failure of the trial court to grant a new trial, the jury having improperly considered the proper elements of damage in answering the issues (a) that the pipe line easement isolated and segregated the remainder of appellees' land,

(b) that the owners of the land would be unable to have ingress and egress over and across plaintiff's pipe line to the railroad, and (c) that the railroad would be unable to lay tracks over and across plaintiff's pipe line.

The first three assignments pertain to issues 1 and 2 and will be considered together. The evidence on such issues was highly controverted as to values. Appellant's witnesses, Roy Eastus, John R. Coon and Luther E. Wilson, testified as to reasonable cash market value of appellees' land (for any purpose) before the easement was taken, to a high of $500 per acre; after the easement was taken, to a high of $350 per acre.

Appellees' witnesses, J. W. (Pat) Murphy, Arthur L. Wolf and R. H. Gamble, valued the land before the easement was taken up to $5,000 per acre; and parts of it, afterward, as of no value at all for industrial property. All the witnesses, on both sides, are men of large experience in the real estate field and are all worthy of belief. Their testimony as expert witnesses, of course, was their "expert opinion" as to values. Each gave his opinion as he believed the values to be, and in detail gave the jury the facts upon which he based that opinion. The jury answered issue No. 1 under proper instructions and definitions of the court. However, it is obvious from jury answers to issues 1 and 2 that they considered, in answering special issue No. 2, the value of such strip of land only as business or industrial property, and did not take into consideration that it could have a value as a farm, dairy, or for some other purpose. We do not consider, however, that the case should be reversed and remanded for this eror. It can be cured by remittitur. The jury was entitled to consider, in connection with market value, in special issue No. 1, evidence showing its most favorable use before the pipe line easement was taken. In answering issue No. 2, in finding the market value, the jury should have considered its most valuable use after the taking. The highest market value of this land testified to by any witness for appellant, as farm land or for any other use (after the easement was taken), was $350 per acre, or

$469.70 for the 1.342 acres. We are of the opinion that if the appellant is credited with $469.70, making the recovery for the difference in the value of the 1.342-acre strip of land before and after the easement was taken, to wit, $872.30, such error would be cured.

We are not unmindful of the holding in the case of Texas Electric Service Co. v. Perkins, Tex.Com.App., 23 S.W.2d 320. Under the evidence in that case the holding was, no doubt, correct.

In this case the jury found a difference of less than 10% in the market value of the land outside the strip on which the easement was taken, while they found the market value of the strip on which the easement was taken to have been 100% destroyed.

A careful reading of this record discloses that the matters considered in arriving at the answers to issues 1 and 2 in no way affected the jury in their consideration of, or their findings to, special issues 3 and 4.

It also appears from the record that all elements of damage considered by the jury were proper elements for their consideration. Gulf Coast Irr. Co. v. Gary, 118 Tex. 469, 14 S.W.2d 266, at page 271, the Commission of Appeals, opinion approved by Supreme Court, holds: "* * * when the whole of the tract is not taken, that the kind and character of easement condemned, and the manner in which the rights of the condemnor are to be exercised and maintained, and the rights and privileges left in the owner, may properly be taken into consideration in assessing the damages. St. Louis, K. & N. W. Ry. Co. v. Clark, 121 Mo. 169, 25 S.W. 192, 26 L.R.A. 751. See, also, annotations in 26 L.R.A. supra. * * * Cureton, C. J. The opinion of the Commission of Appeals answering the certified question is adopted and ordered certified." See also Southwestern Gas & Electric Co. v. Anderson, Tex.Civ.App., 217 S.W.2d 47; Kelsay v. Lone Star Gas Co., Tex.Civ.App., 296 S.W. 954.

Appellant's assignments 4 to 6 inclusive, set out in substance above, will be considered together. In considering these assignments it is necessary that we consider

the evidence more in detail. J. W. (Pat) Murphy testified with reference to the 35-foot strip on which the pipe line was built, that the market value of this 35-foot strip containing 1.342 acres was $1,342. He then testified, with reference to the county road shown by the map, that the Hunt lands consisted of over 400 acres (the whole tract), and that 750 feet fronted on the Dallas-Fort Worth Highway. He then testified with reference to three small tracts— two consisting of less than an acre each and the third containing 1.8 acres—cut off by the pipe line, stating: "As a result of the installation of this pipe line, I believe that area becomes wasted." Asked what the market value of the 35 feet would be after the line is laid, he answered, "No value." Asked how he arrived at this damage, witness stated that the highest and best value of the Hunt properties was for industrial purposes; that in his opinion these areas were small; that since the line carried gasoline, nobody would build on the line, or on these small tracts, or closely adjacent to the line. He then testified with reference to signs on the line put there by the appellant, as "Dangerous, Keep Out"—"or something of that sort." He testified as to a 2.650-acre tract valued at $1,000 per acre before and that 200 feet west of the place where the pipe line is constructed along the line, a tract containing 10 acres was of the value of $10,000 before the pipe line was installed;—afterward, nothing; that the land is lost so far as industrial development is concerned. There were three pipe lines on this tract before the building of the Texas Pipe Line Company's line; owned by Lone Star Gas Company, United Gas, and Humble Pipe Line. The witness stated the new gas line would be an additional burden on the property; that the more pipe lines out there, the more difficult it would be to plat the property and arrange it for use. That he had been all over the whole 400 acres; had broken it up so as to ascertain the amount of acreage adjacent to this new pipe line and its effect on the acreage farther away; that there are approximately 240 acres between the south Highway 80 and a draw on the north that runs east and west and the boundary of the property on the west, which he divided into three sections of 80 acres each; the 80 acres nearest Highway 80, Santa Fe Railroad and the county road was worth $1,000 per acre; the next 80 acres with the same specifications, next nearest Highway 80, next nearest the Santa Fe Railroad, next nearest the county road, was worth $800 per acre. The third 80-acre tract with the same specifications he estimated to have a market value, prior to the taking, of $600 per acre. The value (excluding the 35-foot strip) before the installation was $193,000; and $172,000 after the installation. The land is located about six miles from the Dallas County Courthouse, adjacent to the city limits. In his opinion the highest and best use this land could be put to, being outside the city limits, was for industry; however, certain areas could be used for housing of industrial employees— usually an adjunct to large commercial areas.

Arthur L. Wolf testified that he was presently putting on industrial projects adjacent to Dallas and was familiar with industrial properties; that he had made an appraisement of the 400 acres involved in the Hunt lands. He then proceeded to designate the property on the maps and plats, pointing out the three little cut-off tracts, giving their value at $750 per acre, and that they had no value after the laying of the pipe line; that all utility was lost; he also figured that some adjacent land to the three tracts, approximately 15 acres, is damaged to some extent, a matter of $2,250. 240 acres out of the 400-acre tract would be affected by the building of the pipe line on the acreage shown by the map. The estimated market value prior to the erection of the pipe line at $199,000, the difference in market value on the remainder before and after the building of the pipe line is approximately $15,000.

R. H. Gamble, a rebuttal witness for appellees, testified that he had developed industrial and business properties in Dallas since January 1, 1909; that he was handling the 400 acres belonging to the Hunts; had been in charge of it for many years. When questioned about appellant's Exhibit No. 2,

which does not show all of the Hunt acreage, and appellees' Exhibit No. 3 showing, in heavy outline, all the Hunt acreage, here reproduced as follows,

he testified in detail with reference to the undeveloped Hunt 400 acres. He described the roads, railroads, and three pipe lines already on the property, stating that although he could have sold small tracts out there any number of times, he refused to sell until he could get a large industry; that appellees have been holding the land, on his advice, for industries; he thought it to be one of the best large tracts around Dallas, now, for industrial property, since it practically adjoins the city limits. Breaking down the tract, he divided 240 acres, out of the 400 acres, into three 80-acre tracts which he thought were most damaged—or more affected by the building of the pipe line. "The reason I suggest the 240 acres, there is a draw running northwest and southeast through that, the north part of the Hunt land; that would be difficult for them, the Santa Fe or the Texas and Pacific to cross"; that the 240 acres affected had a market value of $1,200 per acre; that the difference in the market value of the whole tract before and after the taking was $23,-322.80.

This evidence by qualified expert witnesses clearly raised the fact questions submitted in issues 3 and 4, and fully supports the jury's answers. These assignments are overruled.

By its assignment No. 7 appellant attacks the inclusion in issues 3 and 4 of 55 acres of land owned by appellees in the Archer Survey.

Appellees' plat (Exhibit No. 3) shows the 400 acres of Hunt land. We do not understand that appellees are limited, by the field notes of the plat introduced by appellant, in their recovery of damages to the land outside the strip taken, or to the land described in appellant's petition. The court in its issues 3 and 4 only submitted that part

of appellees' land within the McLaughlin and Archer Surveys. The testimony raised issues of damage to that land. If there had been testimony of damage to the lands in the Horton Surveys, that land could also have been properly included in the issues. The assignment is overruled.

Appellant by its assignment 8 complains of the excessiveness of the verdict. We have heretofore quoted from the evidence which amply supports the jury verdict. We therefore overrule the assignment. Southwestern Gas & Electric Co. v. Anderson, Tex.Civ.App., 217 S.W.2d 47.

By point 9 appellant complains of the refusal of the court to permit the introduction of testimony by the witness R. H. Gamble concerning the acquisition of the Humble Pipe Line Company of its right of way and easement across land involved. The testimony was immaterial. The Humble had the right of eminent domain, and its line having been theretofore constructed, the amount paid at that time for the Humble easement sheds no light on the market value of appellees' lands at date of the taking of this easement; the situation was entirely different. Appellant's pipe line was the fourth to be constructed on the Hunt lands; the negotiations were remote as to time; and the evidence conclusively shows that the Humble pipe line was laid in the bottom of a gully or creek, a considerable distance from appellant's pipe line. Appellant is not concerned with the damages paid for the construction of other pipe lines on the Hunt lands. Appellant must take the situation as found on the date it condemned the right of way and became obligated to pay the resulting damage by reason of the additional burden placed on the Hunt lands at that time. The assignment is therefore overruled.

In assignment 10 appellant complains of the court's sustaining objections to appellant's questions to witness Gamble regarding the name of an industrial concern that was negotiating with such witness for the purchase of a tract of land out of the Hunt property. Appellant's counsel, as an asserted basis for his question, had theretofore, in cross-examination, elicited an answer that Mr. Gamble was presently negotiating with some concern for an industrial site, not designated, on some of this property. Appellees' counsel objected to the excluded testimony for the reason that it appeared to be simply a negotiation; that no offer to sell or purchase had been made; and the testimony was immaterial, whether favorable to appellant or appellees; it was not a proper predicate for market value and the negotiations were privileged, in that the witness did not desire to make public the name of the people or concern with whom he was negotiating, there being no sale consummated. There was no evidence that such negotiations inquired about had ever been communicated to appellees or that they could be bound in any way by negotiations not ratified by them. The court did not err in its ruling with reference to said testimony. The evidence had no probative force on the issues involved, to wit, the market value of the lands immediately before and immediately after the taking of the easement. No harm resulted from its exclusion.

The court did not err, as complained of by appellant in its 11th assignment, in refusing to grant appellant's motion for new trial based upon the grounds that the jury improperly considered proper elements of damage. The court submitted approved issues and properly charged the jury as to what they could and could not consider in answering such issues. The maps, physical facts, and evidence, show that appellees' land is limited in its value by the appellant's easement. The appellant has paramount rights in the strip of land for its use as covered by the easement. Gulf Coast Irr. Co. v. Gary, 118 Tex. 469, 14 S.W.2d 266; Gulf Pipe Line Co. v. Thomason, Tex.Civ.App., 299 S.W. 532. Even if it was improper, which it was not, appellant's counsel elicited from witnesses, on his own examination, testimony with reference to what the railroads would or could do with reference to pipe lines. It is therefore now barred from asserting such complaint.

The judgment below is affirmed on condition that the appellee within fifteen days

from this date file a remittitur in the sum of $469.70; otherwise the judgment below will be reversed and the cause remanded.

BOND, C. J., dissents.

BOND, Chief Justice.

This is an action for damages arising out of a condemnation proceedings. Appellant, The Texas Pipe Line Company, acquired a perpetual right-of-way or easement for the purpose of laying a pipe line underground and across a corner of appellees' land for carrying oil, gas, mineral solutions, liquefied minerals and products thereof. As a result of the first step in the condemnation proceedings, appellees were allowed damages in the sum of $750. From this award appellees appealed to the County Court where, on trial de novo to a jury, they were awarded $16,073.60. Appellant has perfected appeal, raising points of error principally involving the excessiveness of the award and the action of the trial court in refusing its motion for new trial based primarily on the evidence as being insufficient to support the verdict of the jury and to sustain the judgment of the trial court on the verdict.

The land involved in this proceedings is located about six miles west of the Dallas County Court House; has a south frontage on U. S. Highway 80 and an east frontage on the Eagle Ford, or Chalk Hill Road. There are no structural improvements on the land; it is devoted principally to the pasturing of stock, or to dairy farming, with some little argricultural farming. Much of it lies in the bottom,—what is commonly called bottom land, crossed by a creek or branch, and traversed north and south by three other pipe lines—the Humble pipe line, Lone Star gas line, and the United Gas line—all having acquired easement rights by contract. Appellant's easement is 35 feet (17½ feet on each side of the pipe line) in width; enters appellees' land about 90 feet west of the southeast corner, extending in a general course, northeastwardly, diagonally across the southeast corner to a point approximately 450 feet, to the east line of appellees' land; thence it goes off of appellees' land onto the G. C. & S. F. Ry. right-of-way; thence, after cross-ing land belonging to others, re-enters appellees' land approximately 1300 feet from its southeast corner; from there, it extends diagonally northeastwardly across another southeast corner of plaintiffs' land for about 700 feet, and exits at their east line; embracing an area approximately 1670 feet in length, covering 1.342-acre strip of land.

Appellees alleged in their petition that the increased burden on their land by the construction of appellant's pipe line, because of potential dangers and hazards, will prevent commercial industries (for which the land is suited and which they contemplate to be placed thereon) from having railroad switch track facilities, in that, such enterprises and railroad companies will not construct buildings or switches on, near, or adjacent to such pipe line, for fear of such dangerous hazards. Appellees further allege that, the location of the pipe line being at, near, and adjacent to residential subdivisions and industrial areas in the City of Dallas, and in an area of railroad and highway facilities, the way in which appellant's pipe line crosses their land (diagonally across the corners), effectively prevents development of their land for purposes to which it is admirably adapted,—all to their damage of at least one-half of its present value, a total of $380,000; and that they will suffer damages to other tracts of land belonging to them, adjacent to the land crossed by appellant's pipe line, to the extent of $10,000. In the testimony, much attention was given to "expert" witnesses as to the dangers inherent in the pipe line, the potential uses to which appellees' land is adapted, and the possible adversity of industries, railroad companies, and citizens generally, to cross the pipe line for fear of the hazards inherent in the pipe line,—thus affecting "sales resistance"; and diminishing the value of the land to the extent of one-half its value, or $2,500 per acre.

In answer to special issues submitted, the jury found that the reasonable market value of the 1.342-acre strip of land covered by appellant's right-of-way, or easement, immediately prior to the taking of said easement was $1073.60, and that the same strip of land immediately after the taking had no value; that the reasonable market value of

the remainder of the 185 acres adjacent to the said strip, exclusive of the aforesaid strip, and 55 acres in the Archer Survey adjoining the 185 acres on the west, immediately before the taking was $180,000, and that the value of the same land immediately after the taking was $165,000. On such verdict the trial court entered judgment against appellant for $1,073.60 as the full value of the 1.342-acre strip, and $15,000 for damages to the remainder of the 185 acres of land.

It will be seen throughout the evidence that appellees presented potential elements of damage on the theory that the easement constituted a "taking" of the strip of land, which entitled them to recover damages for the full value of the strip, determinable at the time of the "taking;" and, overall, the jury's verdict forcibly indicates that they held the same theory—that the "taking" of the strip of land deprived the owners of its full value, notwithstanding the charge of the trial court directing the jury that the owners (appellees) "have the right to cultivate the land included in said right-of-way, or to use the same for pasturing livestock, and to make any other use of said land as they deemed fit, except in-so-far as said use does not interfere with the rights of the plaintiff (appellant) above outlined"; and, further, directing the jury that they should "not consider any evidence, if any, relating to remote, speculative or conjectural uses, if any, but you may take into consideration all the uses for which it is suitable, adapt-able and needed, or likely to be needed in the reasonably near future according to the evidence that has been submitted to you in this case"; and, too, the undisputed evidence shows that the strip of land involved, as well as the remainder of appellees' land, is presently being devoted to stock grazing, rented for dairy and agricultural farming, and that no other use has been made of the land for more than 25 years. It is evident that the jury's verdict as to the value placed on the strip of land before it was burdened with the easement, and valueless after being so burdended, is based upon untenable "expert" testimony that such strip of land was "taken", and had no value whatsoever burdened with the easement.

The nature, title and interest in the land condemned did not vest in the condemnor the actual dominion, control, and usage of the land; only impressed its acquisition for construction of its pipe line beneath the surface of the land at a depth as required by law, which did not constitute an all-out "taking," as to entitle appellees to recover as damages the full market value of the strip; and, further, the easement simply grants rights to appellant to go upon and over the surface of the land to construct, repair, rebuild, and maintain its pipe line, to enable it to carry liquefied products. In law, the condemnor is granted no right to interrupt the title owner's use of the land not inconsistent with the condemnor's rights; and the condemnor cannot use the land for any purpose not included in its grant. When an easement is granted which still leaves the owner with property rights of material and measurable value, the condemnor need not pay for the entire value of a fee simple.

In cases, such as easements for electric power lines for poles and wires over an owner's land, and gas lines for pipes beneath the surface, and other public enterprises exercising the right of eminent domain, where no actual taking of the land is involved, compensation is not based on the full value of the easement as if there was a "taking." Therefore, the main question in such cases is to take into consideration every element of inconvenience and disadvantage resulting from the nature, title and interest of condemnor's easement as such affects the value of the land burdened therewith; and, in fixing the amount of damages in such cases, the reasonable market value of the premises immediately before the land was burdened, and the reasonable market value immediately after it was so burdened, must be considered and the owner allowed the difference. The reasonable market value of the land, in either instance, is the price the land would bring if it were offered for sale by one who desires but is not obliged to sell, and is bought by one who is willing to purchase but is not compelled to buy.

In the case of Texas Electric Service Co. v. Perkins, Tex.Com.App., 23 S.W.2d 320,

324, the Electric Company sought to condemn an easement of the nature as here—a limited easement—over the owner's land. There, as here, the owner contended that the strip covered by the easement was a "taking." The court held as a matter of law that the strip of land "[was] not taken" as to entitle the owner to recover as damages the full market value of the land at the time it was appropriated. The "taking" in all such cases is limited to the statutory rights granted a condemnor short of absolute fee simple, Art. 1497, R.C.S.; Kelsay v. Lone Star Gas Co., Tex.Civ.App., 296 S.W. 954.

In Gulf Coast Irrigation Co. v. Gary, 118 Tex. 469, 14 S.W.2d 266, 271, it is said: "We think it proper to say, however, that in a condemnation proceeding by an irrigation company, under the laws of this state, the irrigation company does not take a fee-simple title to the land condemned, but merely takes an easement that carries no greater dominion by the irrigation company than is proper and needful to carry out the purposes for which the land is taken."

An examination of the submitted issues in the charge of the court, the verdict of the jury, and the judgment, in the light of the testimony, discloses that the jury found there was an actual "taking" of the 1.342-acre strip of land condemned, when, in reality, the land was burdened only with the condemnor's legal rights; the owner of the fee had every right of use unimpaired that he ever had, except that which was granted to appellant. The verdict of the jury is self-evident of the fact that it ignored the charge of the court relative to the nature of the right, title and interest acquired by the appellant in and to the strip of land, and found that the acquisition over and across the strip constituted such a taking as to entitle appellees to recover for damages the full reasonable market value of the land at the time of the acquisition. Hence, as to the finding and the judgment of the court based thereon, as said by the Supreme Court in Texas Electric Service Co. v. Perkins, supra, "This so affects the entire verdict and judgment that the case will have to stand reversed and remanded."

Courts are committed to the rule that, in fixing the damages sustained by a land owner in the consequence of an appropriation of, or injury or damage to, his property in condemnation proceedings, the jury may take into consideration every element of annoyance and disadvantage resulting from the establishment and maintenance of the grant which would influence intending purchasers' estimate of the market value of such property. The question is simply how much damage has been done to the owner's property. A perpetual easement, as here, constitutes an infringement of the previous rights of the owner in his property, so he is entitled to recover damages to whatever extent his former rights have been interfered with. The full use of his property rights and whatever infringes thereon must be paid for as damaging to the land. From a careful examination of the record here, it is evident that the damage of $15,000 awarded appellees is not warranted for diminution in market value of the remainder of appellees' lands not covered and appropriated to the use of the pipe line. Appellees make no claim that appellant acquired any right, title or interest whatsoever in any other land belonging to them, or deprived them of any of their rights to land outside of the 35-foot strip; or that their property outside the easement strip was presently damaged by the construction of the pipe line.

There having been no actual physical appropriation—a taking—of any of the remainder of appellees' land not covered by the easement, and no direct physical damage or injury inflicted thereon, then, before appellees can recover damages to the remainder, it must be shown that the location of appellant's pipe line on the easement strip actually damaged or injured the remainder;—and not some anticipatory, remote, speculative or conjectural damage or injury that might never occur, for some prospective or contemplated use for which the land is suitable. The only use to which appellees' land has ever been devoted has been for ordinary pasturing of stock, dairy and farming purposes; no evidence is in the record that appellees intend in the immediate future to change the use to which

they have been using the property. The mere fact, as shown from the record, that the location of the land is admirably suited for other purposes—subdivided into lots for residential purposes and for industrial plants—without more, does not give rise to any element of damage for which appellant is liable. To sustain damages to the remainder of appellees' land, it will have to be assumed that the owner is going to subdivide the land into lots for residential or industrial purposes; then assume that such lots or areas would be readily occupied, but for the pipe line; then assume that, if occupied by residents or commercial industries, they would be unable to secure railroad switch facilities; and then, lastly, assume that the railroad companies would not supply the switch facilities because of the inherent hazards incident to the pipe line. Evidently such are, or may be, conditions subsequent; that is, when such do or do not happen, are or are not performed, as the case may be, appellees' claim for damage is defeated. The elements of damage as the basis for the diminution in value of the remainder of appellees' 185 acres of land, as found by the jury, are too far-fetched, too remote and speculative, to have any probative force to support the damages awarded.

In the majority opinion is a confession of error in the jury's findings that the 1.342-acre strip of land, burdened with the easement, had (according to some testimony of "expert" witnesses) a value as a farm, dairy, or for some other purpose; but, says the majority, "It is obvious from jury answers to issues 1 and 2 that they considered, in answering special issue No. 2, the value of such strip of land only as business or industrial property. * * * In answering issue No. 2, in finding the market value, the jury should have considered its most valuable use after the taking. The highest market value of this land testified to by any witness for appellant, as farm land or for any other use (after the easement was taken), was $350 per acre, or 469.70 for the 1.342 acres. We are of the opinion that if the appellant is credited with $469.70, making the recovery for the difference in the value of the 1.342-acre strip of land before and after the easement was taken, to wit, $872.30, such error would be cured." The majority overlooked the testimony of other "expert" witnesses that the land before "taking" was of the value of $5,000; and after the "taking," burdened with the easement, it was of the value of $2,500. The mere fact that some witness testified that the 1.342-acre strip, after "taking," was worth $350 per acre does not justify this court, with appellate jurisdiction, to usurp the province of the jury and trier of the facts, and arbitrarily set a value of its own, rather than reverse and remand for the error committed. A remittitur will not cure errors made by the verdict of the jury on fact issues, and this court is without the power to act in judgment contrary to the trier of facts. Appellant was entitled to have the jury determine the question on properly submitted issues; and, having founded its verdict on the theory of "taking of the land," when it was not taken,—leaving the fee in the owner, the error is fundamental and cannot be "cured" by the action of this court.

A glance at the "expert" testimony showing that the entire 400 acres of land belonging to appellees was damaged by appellant's 4-inch pipe line laid two feet under the surface and across two corners of the land (an easement right in and to 1.342-acre strip) in the sum of $2,500 per acre; that the two small corners of approximately one-third-acre each and a strip of 200 feet on either side of the easement was entirely destroyed, of no value for any purpose whatsoever,—as testified by one of the "experts," "Ah, well, one could put a tent on it," evidences biased persuasion which is reflected in the verdict of the jury in assessing $16,073.60. Such verdict should not stand.

I have considered appellant's further points of error, but from what has been said above on the primary issues in this appeal, the judgment of the court below should be reversed and cause remanded for new trial. Other assignments, or points of error, fade into insignificance, as compared to the primary issues.

I respectfully enter my dissent.