THE TEXAS PIPE LINE COMPANY V. G. DRUMMOND
HUNT ET UX.

No. A-2363. Decided March 8, 1950.
Rehearing overruled April 5, 1950.
(228 S. W., 2d Series, 150.)

34

*William R. Sands,* of Fort Worth, for petitioner.

The Court of Civil Appeals, after finding that there was error in the findings of the jury in that after finding a precondemnation value of the land in controversy also found that after condemnation the land had no value, thus awarding defendants full value for their land, erred in not reversing the judgment of the lower court and remanding the case for another trial. Gulf Coast Irr. Co. v. Gary, 118 Texas, 469, 14 S. W. 266; Kelsay v. Lone Star Gas Co., 296 S. W. 954; Texas Power & Light Co. v. Hering, 148 Texas 350, 244 S. W. 2d 191.

*Willis & Lewis* and *J. Hart Willis,* of Dallas, for respondent.

Even though the Court of Civil Appeals did find that there was error in the jury's answer to special issues regarding the value of the land after condemnation, since remittitur was filed and the finding of the jury was supported by the pleading and the evidence, the error, if any, was harmless and cannot be complained of by petitioner. Freeman and Freeman Oil Co. v. Lyman, 121 S. W. 2d 644; State of Texas v. Carpenter, 126 Texas 604, 89 S. W. 2d 194; Texas Electric Service Co. v. Perkins, 23 S. W. 2d 320.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

By a proceeding in the County Court of Dallas County at Law No. 1, petitioner, The Texas Pipe Line Company, condemned for pipe line right-of-way purposes, including piping of all types of petroleum products, a strip of land 35 feet in width and of 1.342 acres total area, out of a tract of 185 acres or more lying about six miles west of the Dallas County Court House and owned by respondents, Mr. and Mrs. Hunt. The latter claimed very large damages and were actually awarded $16,073.60 based on jury findings to the effect that (a) the precondemnation market value of the 1.342-acre strip was $1073.60 and its postcondemnation market value zero; (b) the depreciation in market value of the tract other than the strip, by reason of the condemnation, amounted to $15,000. The pipe line company appealed from this award, assigning errors in connection with the $15,000 portion thereof as well as error in the judgment and underlying findings in so far as they in effect treated the condemnation as entirely destroying the value of the easement strip. The Court of Civil Appeals sustained only the assignment last mentioned, as to which, however, it did not re-

verse the case but affirmed it upon requirement of a remittitur of $469.70, the Chief Justice dissenting. 222 S. W. 2d 128. This action amounted to the appellate court substituting a post-condemnation value of $469.70 for the easement strip in lieu of the jury's valuation of zero and subtracting the former from the $1073.60 fixed by the jury as the precondemnation value, thus reducing the award by $569.70. The Court arrived at its figure of $469.70 by applying to 1.342 acres a valuation rate of $350 per acre which it said was the highest post-condemnation value testified to by any of the witnesses for the condemnor.

We first dismissed the application for writ of error for want of jurisdiction under paragraph 1 of Article 1821, Vernon's Annotated Civil Statutes, considering no conflict of decision to be shown nor questions of "the Revenue Laws" or statutory construction to be involved, and it having been our view in disposing of recent applications, that condemnation cases were "any civil case appealed from the county court", and therefore final in the Court of Civil Appeals, even though the values in controversy might far exceed $1000. On motion for rehearing of the present application we were reminded that in several earlier instances we had followed a contrary course, although it appears that we have never expressly ruled upon the point. We granted the writ subject to resolving the question definitely at this time, and have concluded that we do have jurisdiction of the cause, despite absence of conflicts and questions of statutory construction or the Revenue Laws.

■ The statutory paragraph in question originated in 1892 as part of Section 5 of Chapter 15 of the Acts of the 22nd Legislature, 1st Called Session, setting up the Courts of Civil Appeals, after the 1891 amendment to Article V of the Constitution, whereby those courts were created. See Gammels Laws, Vol. X, p. 389 et seq. The original provision was in substantially the same form as the present one, except for the addition of the phrase regarding conflicts of decision, which was made in 1923 by Chapter 56 of the Acts of the Regular Session of the 38th Legislature, and except for the change of the article "a" just preceding the first reference to "County Court" to read "the"; this latter alteration evidently being made by the 1925 codifiers. The provision (along with the introductory portion of the article) now reads as follows:

"Art. 1821. The judgments of the Courts of Civil Appeals shall be conclusive on the law and facts, nor shall a writ of error be allowed thereto from Supreme Court (sic) in the following cases to wit:

1. Any Civil case appealed from the County Court or from a District Court, when, under the Constitution, a County Court would have had original or appellate jurisdiction to try it, except in probate matters, and in cases involving the Revenue Laws of the State or the validity or construction of a statute, or cases involving conflicts between decisions of the Courts of Civil Appeals or between a decision of a Court of Civil Appeals and a decision of the Supreme Court."

The phrase "appealed from the County Court" does not, of course, refer exclusively to the County Court established for every county by Article V, Section 15 of the Constitution, as distinguished from the socalled County Courts at Law, established by statute for some of the more populous counties of the state. In matters concerning our jurisdiction, we have consistently treated both classes of courts alike, possibly upon the theory expressed in Johnson v. City of Dallas, Tex. Civ. App., 78 S. W. 2d 265, 268, error refused, that these County Courts at Law "are essentially constitutional county courts, with limited jurisdiction".

■ However, in no event is our jurisdiction in cases from either type of court to be determined exclusively by the words "appealed from the County Court." The remaining portions of the same paragraph must also be considered. Immediately following the words last above quoted come those: "or from a District Court, when, under the Constitution, a County Court would have had original or appellate jurisdiction to try it," and following the latter, the exception of "probate matters", succeeded in turn by the further exceptions above mentioned. The qualifying words "when, under the Constitution," etc., following "or from a District Court" do not, we think, refer exclusively to cases appealed from a District Court. They also qualify the earlier phrase "appealed from the County Court," despite the ambiguous expression "would have had", which may suggest a contrary view. If the qualifying language referred only to District Court cases, it would have been meaningless to insert therein the word "appellate" as part of the clause, "when, under the Constitution, a County Court would have had original or appellate jurisdiction to try it." Such insertion would be thus meaningless because no case appealable to the County Court could at the same time be one within the jurisdiction of the District Court under the law existing when Article 1821 (1) was first enacted or now. The word "appellate" was evidently inserted to clarify the earlier phrase "any civil case appealed from the County Court" in order that such phrase would be sure to include County Court

cases originating in the Justice Court. Therefore the qualifying language beginning with "when, under the Constitution" refers to both cases tried in a District Court and those tried in a County Court. The phrase "under the Constitution" must, of course, have significance. Its most natural meaning taken in context is "according to the present applicable provisions of the Constitution". These provisions define the jurisdiction of the County Court in terms of the money value of the matter in controversy. The Constitution does not contain a grant of condemnation jurisdiction as such to County Courts. Gulf C. & S. F. Ry. Co. v. Tacquard, 3 Willson, Tex. Ct. of App., Civil Cases, Sec. 141; Southern Kansas Ry. Co. v. Vance, 104 Texas 90, 133 S. W. 1043. See also Brazos River Conservation and Reclamation District v. Costello, 135 Texas 307, 143 S. W. 2d 577, 580, 130 A. L. R. 1220. Such jurisdiction, at least in cases involving more than $1000, is purely statutory. It is not jurisdiction "under the Constitution." We do not think the Legislature hoped by enacting Article 1821(1) to forestall jurisdiction of the Supreme Court over cases of perhaps great financial and other importance which future legislatures might thereafter assign to County Courts, as they have validly done with condemnation cases—great and small—under authority of Section 22 of Article V of the Constitution. In this latter connection see Gulf, C. & S. F. R. Co. v. Tacquard; Southern Kansas Ry. Co. of Texas v. Vance; Johnson v. City of Dallas, all supra. We think the intent of Article 1821(1) was merely to deprive the Supreme Court of jurisdiction in cases of limited financial importance described as such in the Constitution; that this is the significance of the words "under the Constitution"; and that such words accordingly leave us free to take jurisdiction of cases involving more than $1000, even though, as in the present instance, they necessarily come up from County Courts. This emphasis on the amount in controversy rather than the name of the court may be. what lay beneath the words in Johnson v. City of Dallas, supra, that County Courts at Law "are essentially constitutional county courts, with limited jurisdiction", and may be the real reason we have always treated both courts alike for purposes of our own jurisdiction.

Since Article 1821(1) was enacted, the legislature has in several localities vested jurisdiction of condemnation cases in the District Court. In such cases from such courts we would clearly have writ of error jurisdiction, if the amount in controversy should exceed $1000, because the cases would be cases appealed from a District Court, and the County Court could not possibly have had jurisdiction of them "under the Consti-

tution". See Southern Kansas Ry. Co. of Texas v. Vance, supra. If we do not also have writ of error jurisdiction over such cases arising in localities in which condemnation jurisdiction rests exclusively with County Courts, there will exist the anomalous situation, in which we have jurisdiction in a case arising in County A but do not have it in the identical case if arising in County B. Since such a condition of affairs is more probably one the legislature would seek to avoid rather than create, its action in giving condemnation jurisdiction to the District Courts in question may well reflect a legislative interpretation of Article 1821 (1) in accord with the conclusion we ourselves have reached. Much the same may be said as to statutes such as Article 3269, Vernon's Annotated Civil Statutes, originally enacted in 1899 and conferring condemnation jurisdiction on all District Courts, where the condemnation is sought by cross action in certain cases.

■ Passing to the merits of the case, we think the court below was correct in its view that the jury finding of zero for the post-condemnation value of the pipe line easement strip could not stand, because in effect it awarded the condemnee the full fee value of the strip. There was, indeed, expert opinion evidence that this strip had no market value after the condemnation; but what the condemnor "took" was merely an easement, which, being in law less than the fee title, can in law only entail compensation for less than the value of the fee title. Gulf Coast Irrigation Co. v. Gary, 118 Texas 469, 14 S. W. 2d 266, 17 S. W. 2d 774; Texas Electric Service Company v. Perkins, Tex. Com. App., 23 S. W. 2d 320. However, and despite petitioner's vigorous contention to the contrary, we also consider that the error in question was properly met by the requirement of a remittitur, which in effect reduced the award by about 45%, thus allowing the condemnee only about 55% of what the jury found to be the fee value of the strip before the condemnation. This situation, even in the absence of an assignment by the aggrieved party complaining of excessiveness "as such", was a proper one for remittitur under Rule of Procedure 440, and was not a usurpation of jury functions by the Court of Civil Appeals. Houston Belt & Terminal Ry. Co. v. Lynch, Tex. Com. App., 221 S. W. 959. The facts of the cited decision are closely in point with those of the instant case, and the remittitur statute (Article 1631 R. S. 1911) substantially the same as Rule 440. The case is not mentioned in Burchfield v. Tanner, 142 Texas 404, 178 S. W. 2d 681, upon which petitioner primarily relies, and we do not consider the latter to have overruled it by implication. In the Burchfield case, which was a suit for damages by

the purchaser of defective cotton seed against the seller, plaintiff's own pleadings established a poundage ratio of 1 to 2 between lint cotton and cotton seed, in cotton which would be produced by good seed. The only evidence on the point showed a ratio of 1 to 1.60 or 2. The jury, however, found that, but for the defect in the seed sold, plaintiff would have grown (a) 30,000 pounds of lint cotton and (b) 90,000 pounds of cotton seed, or a ratio of 1 to 3. The Court of Civil Appeals allowed a remittitur equivalent to reducing the jury finding of 90,000 pounds of seed to 48,000 pounds, thus reducing the lint-to-seed ration so as to make it 1 to 1.6. This was held to be error as in effect an appellate court verdict. The difference between that case and the present one is substantial. In the former, on the basis of the pleadings and evidence, there was a conflict in the two findings as to lint cotton and cotton seed respectively. There was in a sense no verdict at all, because one finding was as good or bad as the other, yet because of the clearly erroneous ratio between them, both could not stand. Such a verdict is not merely an "excessive" verdict for remittitur purposes. In the instant case, the only fault lies in the separate finding that the easement strip had no postcondemnation value, which caused the verdict to be excessive. There was evidence upon which the amount of the remittitur could be within reason based. The case being in general one for remittitur, we do not think petitioner should be heard to complain if the figure selected by the appellate court was the most favorable to petitioner of petitioner's own witnesses. As stated, there was evidence on behalf of respondents that the strip had no market value after the condemnation. The very nature of the remittitur function requires the exercise of some fact finding discretion on the part of the appellate court. Southland Life Ins. Co. v. Norton, Tex. Com. App., 5 S. W. 2d 767; Houston Belt & Terminal Ry. Co. v. Lynch, supra, and cases therein cited.

■ Petitioner also urges in effect that there is no evidence of probative force to sustain the jury finding of a depreciation of $15,000 in the market value of the tract of respondents other than the easement strip as a result of condemnation of the latter for the easement. As stated in the elaborate opinion in State v. Carpenter, 126 Texas 604, 89 S. W. 2d 194, the issue of depreciated market value, which is the ultimate one in such cases, is largely a matter of opinion evidence, and a very wide range of factors may be legitimately taken into consideration by qualified witnesses as the foundation for their opinions. It may well be, as argued, that if the opinions should be shown to be based exclusively upon consideration of remote, fanciful or otherwise

incompetent character, they would have to be disregarded, but, all opinion being at best something of a speculation, it does not cease to have probative force when impropriety attaches only to some, rather than all, of its underlying reasons. The question of market value is thus peculiarly one for the fact finding body, subject to the control of the court in the manner indicated in the Carpenter case, as well as through the powers of the trial court and Court of Civil Appeals with respect to verdicts properly classed as excessive. Of the various and evidently qualified witnesses who testified in this case to a substantial depreciation in market value we cannot say that every reason given in support of these opinions was invalid at law so as to render all the testimony a nullity. That market value might be adversely and substantially affected by the existence of an underground gasoline pipe line lying along all points at which respondents' tract adjoined the right of way of the only railroad abutting on their property is hardly less reasonable to suppose than that an electric power line across a tract may reduce its market value by reason of interference with radio reception of future dwellers on the tract. See Texas Power & Light Co. v. Hering, 148 Texas 350, 224 S. W. 2d 191, 193. We think the jury finding in question had at least some support in the evidence. The questions of great weight and preponderance of the evidence and excessiveness as such of the verdict are, of course, matters beyond our jurisdiction and have been decided adversely to petitioner by both courts below.

The various other points briefed present in our opinion either no error or no error that was harmful to petitioner.

The judgment of the Court of Civil Appeals, affirming that of the trial court subject to remittitur of $469.70, is affirmed.

Opinion delivered March 8, 1950.

Rehearing overruled April 5, 1950.