HOUSTON LIGHTING & POWER COMPANY, Appellant,

v.

Mrs. Lucy T. ADAMS et vir, Appellees.

No. 3502.

Court of Civil Appeals of Texas.

Waco.

Jan. 23, 1958.

Rehearing Denied Feb. 13, 1958.

Baker, Botts, Andrews & Shepherd, W. V. Ballew, Jr., William R. Brown, Houston, Peareson, Scherer & Roberts, Walton S. Roberts, Richmond, for appellant.

Liddell, Austin, Dawson & Huggins, Ernest C. Hurst; Charles R. Vickery, Jr., Houston, for appellees.

TIREY, Justice.

This is a condemnation case. The court submitted six issues to the jury and absent the burden of proof clause they are substantially as follows:

1. What do you find to have been the market value of the 2.247 acre tract of land owned by Mr. and Mrs. Adams, designated Easement A, considered as severed land, immediately before the taking of said easement on July 5, 1955? Answer: $10,111.50.

2. What do you find to have been the market value of the 2.247 acre tract of land owned by Mr. and Mrs. Adams, designated Easement A, considered as severed land, covered by said easement, taking into consideration the uses which the owner of the land may make of said tract of land immediately after said easement was acquired on July 5, 1955? Answer: None.

3. What do you find to have been the market value of the 6.982 acre tract of land owned by Mr. and Mrs. Adams, designated Easement B, considered as severed land, immediately before the taking of said Easement B on July 5, 1955? Answer: $24,437.00.

4. What do you find to have been the market value of Mr. and Mrs. Adams' remaining interest in the 6.982 acre tract of land, designated Easement B, considered as severed land, immediately after the easement was taken on July 5, 1955, taking into consideration the uses, if any, which the owner of the land may make of said 6.982 acre tract of land immediately after said easement was acquired on July 5, 1955? Answer: $700.00.

5. What do you find to have been the market value of the remainder of Mr. and Mrs. Adams' remaining 34 acres, exclusive of the portion covered by the easements condemned, immediately before July 5, 1955? Answer: $119,000.00.

6. Exclusive of increase in value, if any, and decrease in value, if any, by reason of benefits or injuries received by Mr. and Mrs. Adams in common with the community generally and not peculiar to them and connected with their ownership, use and enjoyment of the particular tract of land across which the easements have been condemned and taking into consideration the uses to which the easements are to be subjected, what do you find was the market value of the remainder of Mr. and Mrs. Adams' remaining 34 acres immediately after the taking of the easements condemned on July 5, 1955? Answer: $25,500.00.

The parties stipulated as follows:

1. That the date of the taking of the property was July 5, 1955.

2. That the Light Company had the right to condemn and take that part of defendants' land described in its petition for the purposes alleged.

3. Defendants admitted that plaintiff has fully complied with all statutory requirements relating to the condemnation of defendants' property and that the only issue of fact to be determined

in the trial is the market value of the right of way and easement taken and the amount of damages accruing to the remainder of defendants' property, if any.

4. That defendants shall have the right to open and close the voir dire examination of the jury, introduction of evidence and jury argument.

The decree followed the award and the stipulation of the parties and in so doing awarded to appellees the total sum of $127,348.50. On appellant's motion for new trial the trial court heard evidence as to misconduct of the jury in arriving at their verdict and plaintiff's motion for new trial was overruled by the trial court on condition that defendants file a remittitur of $68,000.00. Defendants filed such remittitur and thereby reduced the judgment to a total of $59,348.50. The Light Company duly excepted to this judgment and perfected its appeal.

Going back to the trial in the County Court, it appears that because of the stipulations filed by the parties, the only issue before the court was the difference in market value of the areas condemned before and after condemnation on July 5, 1955, and the depreciation in value, if any, of the remainder of defendants' property not taken.

Appellant assails the judgment on eight points but summarizes its contentions in this manner:

"* * * this case should be reversed and remanded because (a) the award of $93,500 as damages to the remainder was not within the pleadings or the evidence; (b) the verdict was fatally defective because the same was the result of a unanimous mistake, confusion and misunderstanding, in that when the jury sought to make its finding of the market value of the remainder after condemnation it returned the figure which the jury had determined represented the damages to the

remainder rather than its market value, such resulting in a mistake against appellant to the extent of $68,000; (c) the erroneous jury finding could not be cured by remittitur, as the trial judge sought to do, but a new trial should have been ordered; and (d) the verdict was fatally defective in its entirety because grossly excessive."

The court submitted six issues to the jury. The first two dealt with the before and after value of the 2.247 acre tract of land which was to be fenced for a substation site and designated as Easement A. The next two related to the before and after value of the 6.982 acres to be used for transmission lines and designated as Easement B, and the last two related to the before and after value of the remaining 34 acres.

The jury found that the value of the 34 acre tract of land before the taking was $119,000, or price per acre of $3500, and that the after value was $25,500, or the price of $750 per acre.

Going back to the pleadings, defendants pleaded that the before value of the 34 acre tract was $150,552, and that the after value was $100,368, representing a claim or loss of $50,184 as damages.

We find that there were only four witnesses who testified on the extent of the decrease in value to the remainder of the property. Two of these witnesses were called by the condemnees. The first of these, Mr. Roane, testified to a before value of $153,000 ($4500 per acre) and an after value of $102,000 ($3000 per acre) representing a difference or loss in value of $51,000. The second witness, Mr. Driscoll, testified to a before value of $170,000 ($5000 per acre) and an after value of $136,000 ($4000 per acre), representing a difference of $34,000. Mr. Hornsby, who testified for appellant, said the property would have the same per acre value before and after condemnation, such being $2500 per acre, or a total of $85,000. However, this witness further testified to the effect

that if the property was eventually subdivided, a profit of $400 per lot would be lost on six lots because of the shape of the area left after condemnation, so he concluded the after valuation would be reduced by $2400, to a total of $82,600. Mr. Wessendorf testified to a market value before and after condemnation of $2000 per acre, or a total of $68,000, but he also testified to the loss of six lots in the event of subdivision, representing in his opinion a damage of $4200, thereby reducing the after value to $63,800.

On motion for new trial appellant charged specifically that the answer of the jury to Issue No. 6 was the result of unanimous mistake, confusion, and misunderstanding. In support of this allegation they tendered some of the jurors as witnesses.

W. J. Frazar, foreman of the jury, testified in part as follows:

"Q. What did the jury find in answer to Special Issue No. 6? A. We found $25,500 damages.

"Q. You mention the word 'damages.' A. We put that down, we made a mistake and put that down instead of subtracting it from the $119,000, which we had did, and found it to be $25,500, but we put down the wrong number, we put down the $25,500 instead of what we were subtracting. * * *

"Q. Was there any discussion at all during the jury's deliberation that the $25,500 related to the market value of the remaining 34 acres after condemnation? A. No, sir. We decided that was the damage, the way we found it.

"Q. In other words, the jury in their discussion said it was $25,500 that Mrs. Adams was entitled to as damages. A. That is right. * * *

"Q. You mentioned in writing down a figure, Mr. Frazar, that you wrote down the wrong one. Would you elaborate on that, please? A. Well, we wrote down the $25,500, which was wrong, and that was the way—I don't know why we did that, but we subtracted the $25,500 from the $119,000, then instead of writing down the answer after we subtracted, we wrote down the $25,500, which was wrong. * * *

"Q. Well, now, did Mr. Clay actually do the writing in? A. Yes, sir. * * *

"Q. Did you all tell him what figure to write in there? A. No. All of us voted on that as damages. * * *

"Q. You knew when the verdict was read in Court, you knew it was answered $25,500, right—you heard the Judge read it, right? A. I guess I heard it, but, still, I overlooked it as being the answer to that like it was supposed to be.

"Q. But you knew that the figure was $25,500 when it was read in the courtroom, and just overlooked that it was an error? A. Yes, sir, I did, I overlooked it as an error, yes; I didn't catch it, and if I had, I would have said something about it.

"Q. This $25,500 you thought was the amount of the damages? A. Yes. * * *

"Q. Now, when the jury voted on Issue No. 6, what was said, who called the vote? A. I called the vote.

"Q. What did you say, just what words did you use? A. 'All in favor of that amount raise your right hand.'

"Q. You asked the jury to vote on $93,500? A. Yes.

"Q. They never did vote on $25,500? A. Well, we didn't vote in that way. We discussed it as a matter of damages.

"Q. But you never did call a vote on the $25,500? A. No."

The testimony of juror, J. L. Clay, pertinent to this discussion, was:

"Q. Mr. Clay, did all of the discussion in the jury room with respect to the figure of $25,500 relate to damages to the land? A. Yes, sir.

"Q. None of the discussion in the jury room with respect to the $25,500 related to the market value of the remaining 34 acres after condemnation? A. No, sir. * * *

"Q. When the jury voted on $25,-500 they voted that figure as damage to the remaining 34 acres, didn't they? A. That is correct. * * *

"Q. Now, you mentioned, Mr. Clay, that in considering your answer to the six special issues, that there was a scratch pad on which you did some figuring? A. Yes, sir.

"Q. Is that correct? A. That is right.

"Q. You were the man doing the figuring? A. Yes, sir.

"Q. And that you subsequently transcribed from your scratch pad to the defendants' exhibit 1 the answers that the jury arrived at, is that correct? A. That is correct.

"Q. And you were the man who transcribed those figures from the scratch pad to the answer sheet? A. I was sitting right by the side of Mr. Frazar, and he was nervous and couldn't write, and that was the reason for me putting down the figures. * * *

"Q. Was there any discussion whatsoever in the jury room with respect to market value insofar as Special Issue No. 6 was concerned, anything actually said about market value? A. No. Damages.

"Q. The only thing that was discussed with respect to Special Issue No. 6 was damages? A. Right.

"Q. And what the jury was trying to do, was award Mrs. Adams $25,500 for damages to the remaining 34 acres, isn't that correct? A. That is correct.

"Q. You weren't trying to award Mrs. Adams $93,500? A. No, sir.

"Q. That was about the farthest thing from your mind? A. Everyone in there.

"Q. No one wanted to award Mrs. Adams $93,500? A. No. If we answered it wrong—I don't know how it reads—we just didn't understand it, I guess—just ignorant."

Another juror to testify was Mrs. M. C. Gregory, who testified:

"Q. On Special Issue No. 6, answered $25,500, did the jury vote to answer that issue $25,000? A. Well, we did, but I think that is where we made the mistake.

"Q. Did you vote to answer it $25,500? A. We voted that to be the answer as the damages, $25,500.

"Q. Did you understand the sixth issue asked you how much damages there was? A. Well, it was supposed to be the market value of the land before the condemnation, and the other one was supposed to be the market value after the condemnation.

"Q. Now, you say you may have made a mistake, and what is the nature of the mistake you think you may have made? A. Well, I think that we should have subtracted $93,000 from $119,000, giving you the total of $25,500 damages.

"Q. Why did you make that mistake? A. Well, I don't know. * *

"Q. Did you suggest in the jury room, when they were answering that $25,000, that instead of being the amount of damages that they ought to be answering the amount of market

value? A. No. We didn't come to that.

"Q. You never did discuss the market value afterwards? A. No.

"Q. You thought the Special Issue No. 6 was the amount of damages, and that is what you answered? A. That is right. * * *

"Q. There wasn't any discussion, was there, among the jurors, that the market value, that is, the value of the 34 acres after the taking, was only worth $25,500, was there? A. No.

"Q. In other words, the $25,500 represented what the jurors thought Mrs. Adams had been damaged with respect to her 34 acres, is that correct? A. That is right. * * *

"Q. The jury wasn't trying to award Mrs. Adams $93,500, were they? A. No, sir.

"Q. That didn't enter into any discussion, did it? A. No, sir.

"Q. Did anybody at any time ever say, 'We think Mrs. Adams ought to have $93,500 as damages to the remaining 34 acres'? A. No, sir.

"Q. Did anybody say any figure anything close to that? A. No, sir. * * *

"Q. Is it true that Mr. Clay had a separate scratch pad he was doing some figuring on? A. Yes, sir.

"Q. And that at the end of the figuring that some answers were transcribed from his pad over to the jury answer list that you have in your hand? A. Yes, sir.

"Q. Do you know, of your own knowledge, whether Mr. Clay at any time subtracted the figure $25,500 from $119,999? A. I don't know.

"Q. He could have, but you just don't know? A. That is right."

It is obvious that the jury's answer of $25,500 to Issue No. 6 resulted in the award of $93,500 for loss or damages to the remainder of the 34 acre tract, which was the amount contained in the judgment originally entered by the trial court. Also obvious is the fact that the trial judge was of the opinion, after hearing the jurors' testimony, that the answer of the jury to Issue 6 resulted from unanimous error, confusion, and misunderstanding and he required a remittitur in the sum of $68,000, or the difference between $93,500 and $25,500.

We think this record shows without dispute that in view of the jury's answer to Issue 6, that this award is unsupported by the pleadings, and we think that the evidence on motion for new trial is without dispute that the jury made a unanimous mistake in their answer to Issue 6, wherein they found in effect that the damage to the remainder of appellees' 34 acre tract amounted to $25,500, and not that the market value of the property after condemnation was $25,500. The record shows that appellant first filed motion to disregard the jury's answer to Issue No. 6 because it had no support in the evidence and the trial court overruled this motion and entered judgment consistent with the Jury's finding. On motion for new trial the court heard testimony of some of the jurors, at which time he ordered appellees to file a remittitur of $68,000, and provided that if they did not do so, he would grant appellant's motion for new trial.

As we understand appellees' position, it is in effect that, conceding that the award of $93,500 that was entered in the original judgment was not supported by the evidence, they say that this simply resulted in an excessive verdict of $68,000 being awarded against appellant, which excess was properly cured by the remittitur they filed. Appellant contends that the error cannot be treated simply as a matter of excessiveness, but that even if it could, the error could not be cured by a remittitur.

Appellant cites us to the rule set forth in 29 Tex.Law Rev. 347, 354:

> "As a practical matter, in Texas today it seems that whenever there is an excessive verdict in an unliquidated tort suit, passion and prejudice or some other improper motive likely has affected the jury. Not only is it within the power of the courts of civil appeals to suggest a remittitur, but they are obliged to do so when the only error found is excessiveness of verdict. However, there remains the exception for the class of cases in which the verdict is so grossly excessive as to indicate that the jury failed to decide the case on its merits. In this area the courts will refuse a remittitur and reverse the case for a second trial."

The award of $93,500 entered in the judgment is almost double the amount testified to by the landowners' highest witness and almost three times the amount testified to by the landowners' second witness, and when the remittitur is taken into account it is much greater than the difference in the appellees' highest witness. Under all of the testimony, the greatest difference in value before and after condemnation was $51,000. In the light of the foregoing undisputed circumstances, the award of the jury, less the remittitur, still leaves the verdict excessive.

In this connection it seems to us that the jurors, in considering Issue 6, did not make a true finding thereon. We think the record shows that they considered Issue 6, but were confused while they were considering the testimony thereon, and when they came to arrive at an answer to the issue submitted, they failed to do so. Certain it is that their answer was their conclusion as to the amount of damages to the land rather than their finding of the market value after condemnation. Bearing in mind the testimony tendered on this issue, and all of the surrounding facts and circumstances, we do not believe that the trial judge would be authorized to determine what finding the jury would have made to this issue if they had understood it and had answered the exact issue there inquired about.

Under the rule in State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, the issues submitted to the jury must be the market value before and after condemnation. Undoubtedly the jury did not make such finding in its answer to Issue 6.

In Burchfield v. Tanner, 142 Tex. 404, 178 S.W.2d 681, 683, our Supreme Court said:

> "We cannot agree that the judgment of the Court of Civil Appeals is authorized by Rules 439, 440, Texas Rules of Civil Procedure, relating to remittitur. The vice in the trial court's judgment was not that same was excessive in amount; its vice lay in the fact that the court had no authority to substitute its finding for that of the jury and in that way prevent what would otherwise have been, in the light of the pleadings and evidence, a conflict in the finding. The question is one of authority to render judgment rather than one of excessiveness in the amount of the award."

We think in the case here that we not only have the question of excessiveness, but we have the question of the right of the trial judge to substitute his finding for that of the jury, which is contrary to our judicial history, where testimony of probative force is tendered on the issue. His duty is to grant a new trial. We do not think our views are in conflict with World Oil Co. v. Hicks, 129 Tex. 297, 103 S.W.2d 962; Id., Tex.Civ.App., 75 S.W.2d 905. See also Dallas Ry. & Terminal Co. v. Farnsworth, 148 Tex. 584, 227 S.W.2d 1017.

■ As we understand the cases, our Supreme Court has not changed the foregoing rule. It is true that our Supreme Court, in Texas Pipe Line Co. v. Hunt, 149 Tex. 33, 228 S.W.2d 151, 155, distinguished the Hunt case from the rule it applied in

the Burchfield case, but it did not change or modify the rule in the Burchfield case. We think it is significant that Justice Garwood in the Hunt case pointed out: "There was evidence upon which the amount of the remittitur could be within reason based. The case being in general one for remittitur, we do not think petitioner should be heard to complain if the figure selected by the appellate court was the most favorable to petitioner or petitioner's own witnesses." It is obvious from the foregoing statement that such rule could not be applied here because the greatest difference in the before value and after value in the case at bar of the most favorable witness for appellees amounted only to $51,000 and the difference in the value of the other witnesses was much less. We think the record on the whole conclusively shows that the finding of the jury to Issue 6 was the jurors' conclusion as to the amount of damages rather than their finding of the market value after condemnation. It necessarily follows that to use a remittitur under the foregoing conditions would not be the equivalent of reducing the finding made by the jury, but on the contrary it would amount to an entry of a finding of the trial court where none was actually made by the jury. We think that this brings this case clearly within the doctrine announced in the Burchfield case, supra, as well as the doctrine announced by our Supreme Court in Caylat v. Houston East & West Texas R. Co., 113 Tex. 131, 252 S.W. 478. We do not think the City of Carrollton v. Rawlins, Tex.Civ.App., 291 S.W.2d 955 (writ ref.), nor Whited v. Powell, Tex., 285 S.W.2d 364 are applicable here.

Appellees, in their Crosspoint No. 1, say: "Since the damages to appellees' remaining land covered by Special Issues Nos. 5 and 6 is a severable issue, even though the court should hold the judgment entered on this issue erroneous, under Rule 434 the case should be remanded for a trial of the damages to appellees' remaining land issue only and the judgment entered on Special Issues Nos. 1, 2, 3 and 4 fixing the value of the easements taken should be affirmed."

■ We are not in accord with this view and do not think it should be labored for reasons which we shall hereinafter briefly state. First of all, this condemnation suit is one that is very important to the condemnees as well as the condemnor. We are of the firm view that this cause could not be tried with fairness to either party without a full development of all the issues pertinent to a determination of the cause. We are of the further view that a trial of this cause by piecemeal, as suggested in appellees' Crosspoint 1, could easily result in an unfair verdict to either party, and we are of the view that justice and equity require that the cause be reversed and remanded in its entirety. See Luling Oil & Gas Co. v. Humble Oil & Refining Co., 143 Tex. 54, 182 S.W.2d 700; Texas Employers' Ins. Ass'n v. Lightfoot, 139 Tex. 304, 162 S.W.2d 929.

In appellant's brief we find this statement: "Other cases both by the Supreme Court and the various Courts of Civil Appeals make it entirely clear that the true test is whether there is an indivisible cause of action involved." It is our view that this is the exact situation here, and for such reason appellees' Crosspoint 1 is overruled, and the cause is reversed and remanded.

Because this cause must be reversed and remanded, we refrain from further discussion of each of the other points raised by appellant in its brief, since we do not know what the evidence may show upon another trial. So our view as to excessiveness of the verdict is confined solely to the jury's answer to Issue No. 6.

Reversed and remanded.