**CENTRAL POWER AND LIGHT COMPANY, Appellant,**

v.

**Emma Larsen GRADDY et al., Appellees.**

**No. 13297.**

Court of Civil Appeals of Texas.

Houston.

Dec. 4, 1958.

On Filing of Remittitur Dec. 11, 1958.

H. K. Howard, Corpus Christi, and Lawrence P. Gwin, Bay City (Bell, Camp & Gwin, Bay City, of counsel), for appellant.

Cullen B. Vance, Edna, and A. Harris, Jr., Bay City (Harris & Salyer, Bay City, of counsel), for appellee.

BELL, Chief Justice.

This is a condemnation suit. The appellant acquired an easement across a 722.8 acre tract of land belonging to appellees. The easement was for the purpose of constructing an electric power line with the right to maintain, repair and renew the line, and appellant was to have the right of ingress and egress for such purposes. The easement or right-of-way was 50 feet in width at some points and 100 feet at other points. The poles for the line were to be about 500 feet apart. The only portion of the land to be actually occupied would be that occupied by the poles. There would be about 21 poles on the land. They were to be

set, for the most part, in pairs with a distance between the individual poles of about 14 feet. The land, except that occupied by the poles, could be used by the owners for any purpose not inconsistent with the appellant's right to construct, maintain and operate the line. The appellant made the easement subject to the limitation that it should not fence or otherwise enclose the right-of-way. Also appellant disclaimed in favor of appellees all mineral interests. The right-of-way enters the land about 526.5 feet west of the northeast corner and runs diagonally across the land to the southwest at about a 45° angle and makes its exit from appellees' land about midway of the south line of the 722.8 acres. The shape of the land is such that about one-fourth of the acreage lies to the east of the right-of-way and about three-fourths to the west. There are 6.8 acres in the right-of-way.

The issues submitted to the jury and the answers of the jury are as follows:

### Special Issue No. 1

"What do you find from a preponderance of the evidence was the reasonable market value of the 6.8 acres of land in the right-of-way across Defendants' land immediately before January 31, 1957?

"Answer: $1700.00."

### Special Issue No. 2

"What do you find from a preponderance of the evidence was the reasonable market value of the 6.8 acres of land in the right-of-way across the Defendants' land immediately after January 31, 1957?

"Answer: $0."

### Special Issue No. 3

"What do you find from a preponderance of the evidence was the reasonable market value of the remainder of the 722.8 acres of land of Defendants

crossed by said easement condemned by Central Power and Light and not included in the right-of-way, immediately before the condemnation on January 31, 1957?

"Answer: $179,000.00."

### Special Issue No. 4.

"What do you find from a preponderance of the evidence was the reasonable market value of the remainder of the 722.8 acres of land of defendants crossed by said easement condemned by Central Power and Light Company and not included in the right-of-way, immediately after the condemnation on January 31, 1957?

"Answer: $170,418.00."

The commissioners had made an award of $1,560. Appellees appealed from the award. Appellant paid $3,120 into the registry of the Court on February 7, 1957.

The court entered its judgment based on the jury verdict, in favor of appellees, for $10,282 together with interest thereon at the rate of 6% per annum from the 31st day of January, 1957, to the date of the court's judgment, and also on the whole judgment thereafter until it should be paid.

Mr. Hale, a witness for the appellees, testified that the 722.8 acres was of the reasonable market value of $175 per acre immediately before the condemnation on January 31, 1957, and that the reasonable market value after the condemnation and construction of the power line would be $155 per acre. He was not asked, and did not testify, concerning the market value of the land in the right-of-way itself, other than is reflected by his testimony concerning the value of the whole tract. The witness testified that this was agricultural land though much of it at the time of condemnation was devoted to grazing, and that the tract was of such size that it, without the power line, was economical and feasible to use an airplane to seed the land and dust and fertilize the growing crops.

However, the presence of the line across the land would so interfere with these operations that the market value of the whole tract would be affected.

Mr. Peterson, also a witness for appellees, testified he had been engaged in farming operations all his life. He had lived in the area of the land involved all his life, and had been very familiar with this land for fifteen years. He considered the land very good farm land. He testified the market value of the land was from $250 to $300 per acre on January 31, 1957. He testified he had had experience in farming land where there was an electric power line across it. Difficulty was experienced because the area around the poles, particularly where the poles were set in pairs, could not be cultivated by use of the equipment generally used. The equipment usually was a four-row tractor and the width of such was 15 feet. The distance between the poles, set in pairs, was 14 feet so the tractor could not go between the poles. Too, many people use 6-row tractors, which are of course even wider. He testified you are unable to follow a normal row pattern. He also stated the drainage, because of the absence of the normal row pattern, would be adversely affected. Further, the witness testified that an airplane could not effectively dust, seed or fertilize the area under or near the line. Where the area around the poles could not be cultivated, weeds and grasses would grow. While this area around the poles could be cultivated and the weeds and grasses controlled, the work in doing so would have to be by hand with the resulting increased expense. The drainage of the land would also be interfered with. In case of the growing of rice, particularly, the necessary irrigation would be interfered with. · The market value, because of the condemnation and the construction of the line, would be lessened $50 an acre. The market value of the land in the right-of-way before the condemnation was, in his opinion, $250 to $300 per acre. The market value of the land in the right-of-way after the taking would be nothing. On cross-examination the witness testified that 50 feet from the poles you could cultivate but airplane operations would be interfered with. The market value of the remainder of the tract would be lessened $50 per acre.

Mr. Hansan, witness for appellees, was engaged in farming operations. His opinion was that the land had a market value of $200 per acre before the condemnation of the easement. After the condemnation and the construction of the line the market value of the land in the right-of-way would be $100 per acre. The market value of the remaining acreage would be lowered $10 per acre. This witness' testimony concerning the elements such as interference with farming operations was in substance the same as the previous witnesses'. The land that could not be cultivated would be an area about 35 feet by 45 feet around the poles.

Mr. Mangum, an aerial applicator, testified to the hazard to dusting and seeding by use of an airplane caused by the presence of the power line. He testified that a large power line, such as is here involved, was a much greater hazard than the usual service lines furnishing power to the homes on farms. He also testified substantially as had other witnesses concerning the fact that the hazard created by the line made dusting and seeding less efficient. This would extend to 75 to 100 feet on each side of the line. If you flew parallel to the line you would fly about 30 feet from the line, but the dusting would not be effective in the right-of-way and for about 15 feet to 30 feet outside the right-of-way on each side. Because of the hazards involved the price charged for the work is greater, usually about one cent per pound for dusting cotton. This difficulty and thus increased cost would apply not just to cotton but to other crops that are dusted.

Mr. Madsen was also called as a witness for appellees. He was a cattleman and farmer and had known the property involved for 30 years. He testified the rea-

sonable market value of the land on January 31, 1957, was $200 per acre. He testified the power line would affect the value of the land for about one-fourth mile on each side of the right-of-way. The value of the land within such area would be lessened about 50%. This is true also for the area within the right-of-way itself.

Mr. Olson, a witness for appellees, testified the value of the land in the tract before condemnation was from $200 to $250 an acre. The market value of the land in the right-of-way after condemnation would be $150 per acre. The balance of the land involved would be depreciated in value about $20 per acre.

Roy Brewer was called as a witness for appellant. He was in the real estate appraisal business. The highest and best use for the land is agricultural—for growing cotton, rice and grain sorghums. (A great deal of the land at the time of condemnation was used for grazing). The market value of the land in the right-of-way before condemnation on January 31, 1957, was $250 per acre. Following condemnation and the construction of the line, it would have a value of $150 per acre. This witness testified there would be no damage to the remainder of the land. He said there would be no interference with drainage. On cross-examination, the witness testified he was a professional appraiser, about 75% to 80% of his clients being companies. The witness thought the presence of the power line would not interfere in any material respect with farming operations, including cultivation (except in the immediate vicinity of the poles), dusting or seeding.

Mr. Westbrook was also called as a witness for appellant. He had been in the business of dusting crops by an airplane. He testified that considering the direction the line runs there would be no particular difficulty in dusting the crops because of the direction of the wind during dusting season. He would fly the plane with the wing tip about 5 feet from the poles. He could effectively dust the right-of-way area. He had never heard of any extra charge being made. The line presents no particular hazard. You can fly under it.

Mr. W. T. Cox was also a witness for appellant. He had known the property involved thirty to thirty-five years. He testified the value of the whole tract before condemnation was $225 per acre. The market value of the 6.8 acre strip in the right-of-way immediately before condemnation was $225 per acre. The value of the strip after the taking was $125 per acre. He was of the view that no damage resulted to the balance of the tract by reason of the taking and use of the right-of-way.

We have felt it necessary to give a fairly detailed summary of the evidence in view of appellant's assertion by a Point of Error that the verdict of the jury is excessive.

■ Appellant by its first Point complains that the trial court erred in overruling its objections to the charge that it permitted appellees to recover the full value of the 6.8 acre strip in the right-of-way and did not instruct the jury that in determining the value of the strip burdened with the easement it should consider the remaining use for ordinary farming purposes to which the land could be put by appellees.

It is true that no such instruction was given immediately in connection with Special Issue No. 2. However, the charge as a whole must be considered. Paragraph 1 of the charge stated that the easement obtained through the condemnation would confer on appellant the right to construct, maintain, renew, repair, operate and remove an electric transmission line together with the right of ingress and egress for such purpose on the 6.8 acres of land in the right-of-way. Paragraph 2 reads as follows:

"2. The Court further charges you that by the terms of the easement obtained by Plaintiff through said condemnation proceedings, all rights in and to said land, not inconsistent with

the rights granted to Central Power and Light Company by said condemnation proceedings, are reserved by the Defendants."

In unnumbered Paragraph 3 of numbered paragraph 4 the term "easement" is defined as follows:

"By the term "easement," as used in this charge, is meant the right to use the 6.8 acres of Defendants' land for the above specified purposes and none other, so that title to the property covered by the easement, as well as the right to use, occupy, and enjoy the property remains in the defendants, provided, however, such use, occupancy and enjoyment of the 6.8 acres by the defendants does not interfere with the use of said 6.8 acres for the specified purposes for which said easement has been acquired by Central Power and Light Company through said condemnation proceedings."

Paragraph 2 calls the jury's attention to the fact that all rights in the land were reserved to appellees that were not inconsistent with the use of the land by appellant for maintaining, operating, repairing, etc., the power line. Unnumbered Paragraph 3 of numbered Paragraph 4 of the charge which defines the term "easement" clearly states that appellant is only given the right to use the 6.8 acres of land and that title to the land covered by the easement remains in appellees as well as the right to use, occupy and enjoy the land so long as such use, occupancy and enjoyment does not interfere with the use of the strip by appellant for the purpose for which it is acquired. Reading the charge as a whole, we think there was no error in the court's charge. Reading these paragraphs together with Special Issue No. 2, we readily see that the jury was told the owner in law had rights in the land in the right-of-way left after condemnation. It was the value of these rights the jury was called on to appraise. Appellant urges that since the jury found the strip had no value burdened with

appellant's easement, this demonstrates the jury thought there was a taking and appellees retained no rights. Such a conclusion does not necessarily follow. While the jury knew the owner retained certain rights, as shown by the testimony of the jurors in connection with the motion for new trial, its members felt they were valueless on the market. Even though, as we will later discuss, the jury was in error in such a conclusion and thus an excessive verdict resulted to such extent, this does not establish error in the charge. Actually the testimony of the jurors showed they knew rights remained in the strip. However, all the testimony showed the land was primarily adaptable to agriculture, though much of it was used for grazing at the time of condemnation, and the jurors concluded since the right of ingress and egress by appellant might destroy any crops from year to year planted on the right-of-way, the strip would be valueless on the market for the purpose of agriculture.

Appellant cites Texas Public Utilities Co. v. Bass, Tex.Civ.App., 297 S.W. 301, as supporting their position. The charge there was clearly erroneous. In that case an easement only was condemned and it crossed only part of a larger tract. Only one issue was submitted and it inquired as to the damage accruing by reason of the taking. In connection with the issue the court charged the owners were entitled to recover the "market value of the land actually taken." (Emphasis ours) Clearly there was no taking and there was no such charge as contained in Paragraph 2 and unnumbered Paragraph 3 of numbered Paragraph 4 of the charge here. It is also to be noted that the charge suggested by the court of civil appeals in that case is in substance not unlike the charge given by the court here in the mentioned paragraphs.

Appellant also cites Texas Power & Light Co. v. Hering, Tex.Civ.App., 178 S.W.2d 162. In that case, as in the Bass case, supra, only an easement was condemned. However, the trial court in its charge submitted an issue inquiring only

as to the market value of the land, on the date of condemnation, embraced in the right-of-way. No issue was submitted inquiring of the value of such land after condemnation burdened with the easement. Clearly such a charge authorized a taking of the land when no taking was sought.

We overrule appellant's Point I.

█ By Points II and III appellant complains of the giving of that part of Paragraph 4 of the court's charge reading as follows:

"4. You are further instructed that in determining the reasonable market value, as that term is herein used, you may consider not only the purposes for which said land may have been shown to have been used at the time of the condemnation, but also the use or uses to which said property may have been shown to be adaptable, by a preponderance of the evidence, as that term is hereinafter defined."

The first complaint is that there was no evidence justifying the charge, and the second complaint is that it constitutes a comment on the weight of the testimony.

The owner of land condemned is entitled to have the jury consider, in determining its market value, the highest and best use to which the land is adaptable. The evidence in this case showed that at the time of condemnation much of the land was used for grazing purposes. In fact, there was a grazing lease in force. However, there was testimony showing it was very fine agricultural land and was best suited for growing cotton, rice and grain sorghums. It was discretionary with the court as to whether the charge should be given. We find no abuse of discretion.

Neither do we feel the charge constitutes a charge on the weight of the evidence. It does not point to any specific character of evidence nor to any specific evidence which would evidence the court's feeling as to what was the use to which it was best

adapted. It specifically leaves to the jury the determination of the uses to which it was adaptable and requires that such determination be made by a preponderance of the evidence.

We overrule appellant's Points II and III.

█ By Points IV and V appellant complains of the action of the trial court in rendering judgment on the verdict because there was no evidence to support the jury's answer to Special Issue No. 2 that the market value of the 6.8 acres in the right-of-way after condemnation was nothing, or, the answer was contrary to the overwhelming weight and preponderance of the evidence.

The effect of the jury's answer to Special Issue No. 2 that the land in the right-of-way is valueless is of course erroneous as a matter of law because there was by the condemnation no taking. However, this error under all circumstances is such that it can be cured by remittitur. The effect of the answer is merely to make the verdict excessive. The highest market value given to the 6.8 acres after condemnation, by any witness of appellant, was $150 per acre, or a total value of $1,020. The verdict is excessive by this amount. The excessiveness will be cured by remittitur in this amount. Texas Pipe Line Co. v. Hunt, 149 Tex. 33, 228 S.W.2d 151; Houston Belt & Terminal R. Co. v. Lynch, Tex. Com.App., 221 S.W. 959; Adams v. Houston Lighting & Power Co., Tex., 314 S.W. 2d 826.

█ Appellant by Points Nos. VI and VII asserts the trial court erred in not granting a new trial because the jury was guilty of misconduct in considering and including in their verdict speculative damages, that is, the value of damages to future crops. Too, it asserts the jury was guilty of misconduct in deciding first to award damages in a certain amount and then adjusting their answers to find market value.

We will not detail the testimony of each witness, but rather we will summarize their testimony. We think a fair appraisal of the testimony is that there was discussion of the elements of damage that affect market value. There was discussion of the increased expense caused by the presence of the power line in fertilizing and dusting crops and in seeding. There was discussion that any future crops along the right-of-way would be lost through the exercise by appellant of the right of ingress and egress, and crops there and near there would not grow as well due to lack of effective dusting and fertilization. However, the testimony of the jurors shows there was no dollars and cents value arrived at by the jury as damages for any of these elements. All that the testimony amounts to is that the jury discussed elements that may be considered in arriving at market value.

Neither do we think the jury arrived at a conclusion as to how much damages they desired to award and then adjusted their answers on market value to accord with such conclusion. The effect of the jurors' testimony is that the market value of the land remaining had been decreased $12 per acre. It is true that some jurors used the term "damage" in referring to the lessened value. This, however, is but another way of saying there was a decrease in market value of so many dollars per acre. It is to be noted that at no time did the jurors decide to give any dollars and cents value to any elements of damage that could be said to make up the $12 per acre arrived at. It is not surprising that the jury arrived at depreciated market value first on a per-acre basis, because this per-acre terminology was used by the witnesses in the case as well as by the attorneys in many of their questions. After deciding the per-acre depreciated value, it was necessary for the jury to multiply 12 by 716, the acreage remaining outside the right-of-way, because Special Issue No. 4 was so framed as to call for

an answer of market value of the whole remaining 716 acres.

We ascribe no significance to the act of the jury in changing the answer to Special Issue No. 2 from $150 to nothing after it had determined the damage to the remaining land to be $12 per acre. It was nothing more than the result of efforts to reach a verdict on all issues by a reconciliation of differences of opinion. All verdicts are products of such.

By appellant's Points Nos. VIII and IX it asserts the verdict as a whole is excessive. We have above set out the testimony of the witnesses. The testimony supports the answers to Special Issues Nos. 3 and 4. The only vice of excessiveness rests in the jury's answer to Special Issue No. 2, which we have already discussed.

By Point No. X appellant asserts error in the court's charge because Special Issues 1 and 2 did not submit the question of the market value of the 6.8 acres covered by the right-of-way considering it as "separate land."

The two Issues have heretofore been quoted. Unquestionably the rule is that the value of this strip is to be determined as separate land. State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194.

We feel that the Issues were so framed as to call for an appraisal of the value of the land in the strip as separate land. It is true that the term "as separate land" does not appear in the Issues. However, we know of no requirement that such term be expressly used in the Issue. The use of it may eliminate controversy over the sufficiency of the Issue. The Carpenter case does not go as far as appellant contends. In that case the trial court had expressly told the jury to determine the value of the acreage taken as a part of the larger tract. This was obviously wrong. The court recognized that there might be many features peculiar to the land taken which were not characteristic

of the other part of the larger tract that would affect the market value. The part taken might be the better part of the larger tract, or it might be less valuable than the other part of the tract. The court merely held that where part of a larger tract was condemned you must, to avoid a double recovery, ascertain the value of the part condemned as severed land, and not determine its value as a part of the whole tract. In the course of the opinion, the court merely suggested a form of submission, using the expression "considered as severed land."

If we analyze the Issues in this case, we find the jury was actually called on to find the market value of the land in the right-of-way as separate land. Both Special Issues Nos. 1 and 2 asked the "market value of the 6.8 acres of land in the right-of-way." Then Special Issues 3 and 4 which seek a determination of the market value of the balance of the tract each inquired as to the value of "the market value .of the remainder of the land crossed by said easement * * * and not included in the right-of-way * * * The issues submit the question of the market value of the land in the right-of-way unrelated to its being· a part of the larger tract. This suffices.

█ Finally, appellant asserts the court erred in allowing interest on the whole judgment from January 31, 1957, because $3,120, being double the amount of the commissioners' award, had been deposited in the registry of the court by appellant February 7, 1957. In this contention the appellant is correct, and the judgment must be reformed. When appellant made the deposit on February 7, 1957, appellees had the right to withdraw the amount of the commissioners' award, to wit: $1,560. Though double this amount was deposited as required by Article 3268, Vernon's Ann. Civ.Tex.St., which was for the protection of appellees in case there was, on trial after appeal, an increase in the award, appellees could not draw down the additional $1,560 deposited. However, upon the judg-

ment of the County Court becoming final after disposition of any appeal that should be taken, appellees will be entitled to draw down the additional $1,560. The payment into court is a tender to appellees as of the date they are by law entitled to draw the money deposited and interest on such amount would stop running as of such date. Baldwin v. San Antonio, 59 Tex.Civ.App. 262, 125 S.W. 596; Housing Authority of City of Dallas v. Shambry, Tex.Civ.App., 252 S.W.2d 963. The Supreme Court, in a memorandum opinion, 152 Tex. 122, 255 S.W.2d 184, expressly approved the opinion of the Court of Civil Appeals on this point in the last cited case.

The judgment of the trial court will be reformed and affirmed, if within 15 days from this date appellees file a remittitur of $1,020. If said remittitur is not filed, the case will be reversed and remanded. Subject to the remittitur, the judgment is reformed so that the $1,560 deposited into court February 7, 1957, will draw interest only from January 31, 1957, to February 7, 1957, and the sum of $1,560 also deposited into court, but which appellees cannot draw down until the mandate issues from this court, will ·bear interest from January 31, 1957, to the date of such mandate only. The balance of the judgment, after the remittitur, will bear interest from January 31, 1957, until paid.

On Filing of Remittitur

On December 4, 1958, we rendered an opinion stating that this cause would .be reversed and remanded unless within 15 days appellees filed a remittitur of $1,020, but that if such remittitur was filed the judgment of the trial court would be reformed and as reformed affirmed. On December 8, 1958, appellees filed the remittitur directed. The judgment of the trial court is, therefore, reformed so that appellees shall have and recover of appellant the sum of $9,262, together with costs of court. Interest at the rate of 6% per annum on the full amount shall run from January 31, 1957 until February 7, 1957.

From February 7, 1957, until the date of the mandate from this Court such interest shall run on the sum of $7,702. From the date of our mandate until the judgment is paid such interest shall run on the sum of $6,142.

Costs of appeal are adjudged equally against appellant and appellees.

As reformed the judgment of the trial court is affirmed.