GRAYCE OIL COMPANY ET AL. V. ED PETERSON ET AL.

No. 5978.   Decided November 12, 1936.
Rehearing overruled January 27, 1937.
(98 S. W., 2d Series, 781.)

*Kilgore & Rogers*, of Wichita Falls, for plaintiff in error.

The record showing a witness to be a practical oil man with twenty-five years experience in the oil business generally and to be familiar with the method of determining and the elements entering into the market value of producing property, and giving facts upon which his answers were based and stating that he knew such facts, said witness was qualified to testify that in his opinion the ninety-day operation of a vacuum pump upon one lease would detract from the market value of adjoining property. City of Waco v. Roberts, 12 S. W. (2d) 263; International & G. N. Ry. Co. v. Motley, 18 S. W. (2d) 782; Stidham v. Lewis, 23 S. W. (2d) 851.

The term "wrongful" as used in the court's charge defining malice, which term and charge dealt only with the matter of exemplary damages, is a term of ordinary meaning and has no technical significance as used in the charge and the trial court committed no reversible error by failing to define the term as so used. Texas Emp. Ins. Assn. v. Henson, 31 S. W. (2d) 669; Texas Nursery Co. v. Knight, 292 S. W., 588; Farmers & Mechanics Natl. Bank v. Marshall, 4 S. W. (2d) 165.

*E. C. deMontel*, of Wichita Falls, *W. H. Sanford*, of Longview, and *Black & Graves*, of Austin, for defendants in error.

It was reversible error for the trial court to admit the testimony of witness that the operation of a vacuum pump upon an oil and gas lease for a period of ninety days would detract from the value of the adjoining lease, because the witness' own testimony showed him to be wholly unqualified to give such an opinion. Hugh Cooper Co. v. American Exchange Natl. Bank, 30 S. W. (2d) 364; Gulf, C. & S. F. Ry. Co. v. Hepner, 83 Texas, 138, 18 S. W., 441; Bell v. Blackwell, 283 S. W., 765.

It was reversible error for the trial court to refuse to define the word "wrongful" contained in its definition of malice. Martin Brown Co. v. Perrill, 77 Texas, 199, 13 S. W., 975; Missouri, K. & T. Ry. Co. v. Long, 299 S. W., 854; Brammer v. Limestone County, 24 S. W. (2d) 99.

MR. CHIEF JUSTICE CURETON delivered the opinion of the Court.

This case is fully stated in the opinion of the Court of Civil Appeals (37 S. W. (2d) 367), and an elaborate restatement in this opinion is unnecessary.

The plaintiffs in error, Grayce Oil Company et al., instituted the suit to recover the value of oil alleged to have been diverted from their producing wells by the operation of a vacuum pump of defendants in error in producing oil from a well, or wells, adjacent to those of the plaintiffs in error, but on a separate lease. The action was also for damages alleged to have been suffered because of the depreciation in market value of the properties of plaintiffs in error caused by the operation of the vacuum pump, and for exemplary damages upon allegations relevant thereto. The verdict of the jury and judgment thereon were favorable to the plaintiffs in error, and defendants in error appealed. The Court of Civil Appeals reversed and remanded the cause because of the erroneous admission of the testimony of one witness, and for errors in the charge. The plaintiffs in error filed a motion for new trial in the Court of Civil Appeals, and applied to this Court for writ of error, which we granted. The defendants in error did not file a motion for new trial in the Court of Civil Appeals, and made no application for writ of error to this Court. We granted the writ of error upon the view to some extent that the case presented to us *necessarily* involved the validity of Rule 40 of the Railroad Commission, relating to the use of vacuum pumps in oil fields and the right of the complaining party to recover damages alleged to have been due to a violation of that rule. In view of the state of the record, however, and our concurrence with the opinion of the Court of Civil Appeals in reversing the judgment of the trial court, the above questions are not before us, and will not be reviewed.

With the conclusion just stated the defendants in error, in the brief filed by them in this Court on June 3, 1932, concur, in part saying:

*"There is not now before the Supreme Court, upon the present writ of error, any question involving the authority of the Railroad Commission, or the effect of its regulations."* (Italics are ours.)

■ After a careful review of the record before us, we have concluded that the Court of Civil Appeals correctly reversed the judgment on the grounds stated, and fully shown in the

opinion. Obviously the witness Olden had not qualified sufficiently to express an opinion as to the effect of the operation of the vacuum pump on the valuaton of the properties of plaintiffs in error. Olden was an experienced oil operator, familiar with the factors ordinarily considered in determining the value of oil leases or of oil wells, but, in his own language, he *"had had no experience with the vacuum, and did not know anything about it."* The effect of a vacuum pump, when applied to one well, on other adjacent wells, or on the common pool of an oil field, is a highly technical subject, (see U. S. Bureau of Mines Bulletin No. 322, "Effect of Vacuum on Oil Wells"), and unless a witness knows the result of such an operation, his opinion as to whether or not it would detract from the value of an adjoining lease would be the merest guess-work, and is of no value to a court or jury trying the issue. In the instant case the vacuum was operated for about 90 days, when it was abandoned under orders of the Railroad Commission. What was the effect of the operation of the vacuum for this period of time? How far distant from the vacuum into the adjoining field would the operation of the pump be effective? Would the texture and porosity of the producing sands or shale have any effect on the operation? What effect would the operation of a vacuum as in the instant case have on the gas pressure, water pressure, and rock pressure on adjacent wells, such as those of plaintiffs in error? What effect has the character of oil, either as to weight or viscosity, have on vacuum operations? Does the operation of a vacuum affect the oil-gas ratio; and, if so, how? Would the operation of the vacuum for a limited period of time open up new ways or channels for oil and gas, so that upon its discontinuance oil and gas coming into the area would flow from the adjacent lease to that of the defendants in error? Or would the operation of the vacuum, and its subsequent discontinuance, cause oil and gas to flow into the general producing area and become available for production on adjoining leases as well as upon the one where it was installed and operated? Or would less oil and gas so flow and be available for production? The witness could not, and did not, answer these questions; for the reason that he knew nothing about the effect of the operation of a vacuum pump. What amount of vacuum could be safely applied to the well in question without injury to the adjoining property of plaintiffs in error; or what amount would be sufficient to cause the flow of casing-head gas as permitted by Rule 40 of the Railroad Commission? Was the amount of vacuum applied in the instant

case more than was necessary to cause the casing-head gas to flow into the gathering lines in use? The witness did not, and could not, answer these questions, because he knew nothing about the operation and effect of a vacuum pump. Yet, in order for the witness to determine the effect of the operation of the vacuum pump here involved on the value of the lease of the plaintiffs in error, it was essential that he be able to answer these questions, or others of a similar nature. We cannot agree with the insistence that the witness Olden was qualified to express an opinion, as he did, in response to the questions objected to, that the operation of the vacuum pump complained of would detract from the value of the lease of plaintiffs in error. Texas Jurisprudence states the elementary rule:

"Before a witness may be allowed to state his opinion of the value of property he must show his qualification. While this does not mean that he must qualify as an expert, it does mean that he must show that he has had opportunities to form an intelligent opinion on the subject, *superior to those of the jury*. Such showing should reveal that he has some knowledge of the property and of its value at the time and place in question." (19 Tex. Jur., p. 206, § 134.) (Italics ours.)

. Again, the same authority states:

"*Whenever the value of the property depends upon something peculiar to itself*, such as its physical condition, individual qualities, particular uses and the like, the witness must, as a rule, show some direct personal knowledge of the property in order to be entitled to express an opinion." (19 Tex. Jur., p. 208, § 135.) (Italics ours.)

■ The witness Olden did not say that he was familiar with the value of an oil lease, adjacent to which a vacuum had been operated, such as is here involved. He gave the formula used by him for ascertaining the value of an oil lease where production had become stable, but not a method where, after becoming stable, the lease had been subjected to a vacuum operation on an adjoining or adjacent lease. In fact, the witness knew nothing about the effect of a vacuum operation. In the instant case the value of the lease of plaintiffs in error depended not merely upon the ordinary operation after having reached stable operation, *but upon something peculiar to itself; namely, the fact that it had been subjected to the operation of the vacuum of plaintiffs in error on an adjacent lease,* which may or may not have affected the operation and production of oil on the lease of plaintiffs in error, and, therefore, may or may not

have affected its value. Of course, a witness as to value need not always be an expert, but he clearly must have a knowledge of the subject matter in question; *which in the instance before us involved a knowledge of the effect of the vacuum operation, made the basis of the damages claimed in this action, or knowledge of the effect of similar operations under similar circumstances.* Texas Jurisprudence on this question says:

"While, as we have seen, a witness on the issue of value need not be an expert, the mere fact that he has observed the property whose value is in question will not always suffice, for he may be incapable of appreciating the value even though he has seen it. It follows that the witness should, as a rule, have not only a knowledge of the specific property to be valued, but also a knowledge of the general subject matter sufficient to enable him to draw a proper conclusion; in other words, he must show that he is better equipped in this respect than the jurors." (19 Tex. Jur., p. 211, § 137.)

■ We have no doubt that the admission of the testimony of the witness Olden, to the effect that the operation of the vacuum pump, as shown by the evidence, detracted from the value of the lease of plaintiffs in error, was erroneous. We agree with the Court of Civil Appeals that this error was a reversible one. Texas Jurisprudence states:

"Perhaps the most fruitful source of error in connection with the receipt of opinion evidence arises in the admission of opinions of unqualified witnesses and in the rejection of opinions of qualified ones. While, as we have seen, mere minor defects in qualification go more to the weight of the opinion than to its admissibility, receipt of an opinion from a witness who is in fact unqualified will often constitute reversible error." (19 Tex. Jur., p. 236, sec. 153.)

Watkins L. Mtg. Co. v. Campbell, 98 Texas, 372, 84 S. W., 424; Gulf, C. & S. F. Ry. Co. v. Hepner, 83 Texas, 136, 18 S. W., 441; Hugh Cooper Co. v. Am. Nat. Ex. Bank, 30 S. W. (2d) 364.

The conclusion stated above is not in conflict with the qualification of the general rule, to the effect that where value is fully established by the opinions of qualified witnesses, any error arising out of the receipt of opinions of unqualified witnesses is harmless, and will not occasion a reversal. In the instant case it cannot be said that the damage, if any, done to the lease of plaintiffs in error was fully established. There was evidence to this effect of course, which clearly raised an issue

for determination, but it was of such a nature that it fell short of fully establishing the justiciable fact involved.

The opinions of the witnesses as to what had taken place, or which might thereafter take place, hundreds of feet beneath the surface, was the result of deduction rather than an actual statement of known facts. In no sense can it be said that their opinions were the result of an actual physical examination of the subsurface area. It is quite true that we have all seen waters running from springs, coming out of orifices which appear to be the mouths of underground channels; and some, no doubt, have seen similar phenomena in mining shafts and dug wells. Indeed, there may be flowing underground streams, such as may be seen in caves, or there may be subsurface streams of water at a shallow depth, such as it is said may be encountered near the great salt lakes in the valley adjacent to the Guadalupe Mountains in Culberson County, and in the subsurface flow of the great sand rivers, like the LaPlatte and Red rivers; and from these experiences, and the knowledge of the facts stated, we might conclude that oil and gas, which like water are fluids, behave in a similar manner, or relatively so; and that when once a vacuum has been applied for a sufficient length of time, channels may be opened by the flowing of oil and gas, similar to those that we have concluded water sometimes follows. On the other hand, all of us have seen springs that appear to seep only out of the retarding sands, rather than to flow from orifices and channels. But a conclusion that gas or oil follow either one or more of these patterns must be by inference and analogy, rather than from an actual examination of the phenomena themselves. Besides, the behavior of gas and oil in the ground is subject to many influences which do not appear to affect underground waters, the activities of which are hidden and can only be surmised or deduced from facts observed at the surface. The forces which cause the movements of oil and gas on the one hand, and water on the other, are vastly different. In the case of water, these forces are primarily the pull of gravity and hydrostatic pressure; while in the case of oil, the motivating forces are generally thought to be the expansive force of gas, which accompanies the oil, and the hydrostatic pressure of water adjacent to the oil stratum. In the case of gas, its own inherent expansive power causes expansion into the area of least resistance. Again, the viscosity of oil, as compared to that of water, necessarily makes for a difference in their subsurface movements, as it does, as all can observe, when the two fluids are on the surface. The obvious

differences between the viscosity of water and oil, and of the forces which cause their subsurface movements, as well as the movements of gas, are such differences in particulars as to make inapplicable the inductive conclusion that the movements of the three fluids will produce the same or similar phenomena beneath the surface of the earth.

One of the witnesses who testified stated that the channels to which he referred in his testimony were perhaps just sandways of least resistance, rather than actual ways from which the sand had been excavated and opened up. This stated conclusion increases, rather than lessens, the technical difficulties which must be encountered in determining a case of this character.

■ Mr. E. D. Martin, who was really an expert with reference to the subject matter of vacuum pumps, etc., testified at great length as to their operation and their effect on oil production. This testimony was, of course, admissible, because the witness was qualified from experience and training to testify. The testimony of this witness was supplemented by that of Mr. Olden, who had long been an oil operator, and who had operated wells for a number of years not far from the locality of this controversy. In connection with the testimony of Mr. Martin, we think the evidence of Mr. Olden, to the effect that the operation of the vacuum pump, as shown by the evidence in this case, would be detrimental to the value of the lease of plaintiffs in error, was very effective and damaging to the defendants in error. It is clear also, we believe, that in this character of case the testimony given by Mr. Olden, the *unqualified witness*, concerning the subject matter of the inquiry, was calculated to be injurious to the defendants in error. And because of the type of fact involved, the subject of serious controversy between the parties, the injury was not cured by the introduction of other testimony from competent witnesses.

Concerning matters not capable of actual verification by factual observation, but dependent largely upon deductive reasoning and inductive conclusions, experts, even though competent, may widely differ. The classic illustration of this is noted by Herbert Spencer when he refers to the fact that when Huyghens discovered and promulgated the undulatory theory of light, Newton declined to accept the correctness of the discovery; and Huyghens likewise declined to accept Newton's theory of gravitation, now universally approved. Spencer then remarks: "That the opinions of experts, even of supreme rank, are not always to be accepted as final." (Spencer's Works,

Appleton's ed., 1902, "Facts & Comments," p. 245.)

In this particular instance each of the great experts was basically right, and yet neither of them believed in the soundness of the other's views. This only illustrates in a very marked degree the care which should be exercised in considering expert testimony. It, of course, should be received when coming from a qualified source; but certainly care should be exercised to prevent the introduction of testimony from an unqualified witness when even qualified witnesses themselves might differ.

■ We likewise agree with the Court of Civil Appeals that the word *"wrongful"* as used in the court's charge should have been defined. The acts of the defendants in error could not be wrongful in the installation and operation of the vacuum pump, unless they violated or trespassed upon some legal right of plaintiffs in error, to their damage. The primary insistence of the plaintiffs in error is that the installation and operation of the vacuum pump did this, because installed and operated without notice and hearing, in violation of Rule 40 of the Railroad Commission. However, in order for the installation and operation of the vacuum pump to have been in violation of Rule 40, it had to be operated at a vacuum pressure in excess of an amount sufficient to gather casing-head gas. If the vacuum pump installation went no farther than that, it would not have been *"wrongful"* under the rule. This rule is copied in the opinion of the Court of Civil Appeals (37 S. W. (2d) 367, 370), and does not prohibit the installation and operation of a vacuum pump for gathering casing-head gas, where the same is to be utilized; but, of course, the vacuum is not to be applied in excess of what is sufficient to bring the casing-head gas into the lines and deliver it at the plant. It is too clear for argument from this phase of the case that it was the duty of the court to define the word *"wrongful"* as used in the charge. We also agree with the Court of Civil Appeals upon the other grounds stated by it for reversal, for reasons which that court has given.

■ After this case reached this Court, and subsequent to the filing of the brief of defendants in error, from which we have quoted above, the defendants in error filed an argument, in which they raised the issue of the invalidity of Rule 40 of the Railroad Commission, for various reasons, including constitutional objections.

We have heretofore stated that the defendants in error did not file a motion for new trial in the Court of Civil Appeals,

nor did they present an application for writ of error complaining of any error committed by the Court of Civil Appeals. This being true, the questions referred to, having been raised for the first time in the argument filed in this Court on April 20, 1935, cannot be considered by us, in view of the fact that we are affirming the judgment of the Court of Civil Appeals. It is quite elementary that neither a plaintiff in error nor a defendant in error may even by application raise questions not presented by them in a motion for new trial in the Court of Civil Appeals; and, of course, the above contentions of the defendants in error cannot be considered here, where they have neither filed a motion for new trial in the Court of Civil Appeals nor an application for writ of error in this Court. The mere fact that the question, or questions, sought to be raised by them may be *fundamental* in character, which a court of civil appeals could take jurisdiction of without an assignment in that court, does not relieve them from the necessity of filing a motion for new trial in the Court of Civil Appeals and assigning such *fundamental* error in the application for the writ in this Court. These statements are in strict accordance with the rules as repeatedly laid down in the authorities. 3 Tex. Jur., p. 267, § 174, p. 300, § 204, p. 294, §199, pp. 296, 297, § 201; Schaff v. Mason, 111 Texas, 388, 391; Holland v. Nimitz, 111 Texas, 419, 432, 232 S. W., 298; Harris v. Shafer, 86 Texas, 318, 23 S. W., 979, 24 S. W., 263; Scalfi v. State, 96 Texas, 560, 73 S. W., 441; Ft. Worth & R. G. Ry. Co. v. Robertson, 103 Texas, 507, 121 S. W., 202, 131 S. W., 400, Am. Cas., 1913a, 231; Link v. City of Houston, 94 Texas, 378, 383, 59 S. W., 566, 60 S. W., 664; Town of Jacksonville v. McCrocken (Com. App.), 232 S. W., 294, 295; Southland Life Ins. Co. v. Hopkins (Com. App.), 244 S. W., 989, 994; Peach River Lbr. Co. v. Montgomery (Sup. Ct.), 124 S. W., 904; Boykin v. S. W. Texas Oil & Gas Co. (Com. App.), 256 S. W., 581, 583; Corn v. Crosby Co. Cattle Co. (Com. App.), 29 S. W. (2d) 999, 1000.

With reference to the necessity of filing an application for writ of error in this Court, Texas Jurisprudence, cited above, states:

"The petition must state 'the grounds upon which a writ of error is prayed for'; that is to say, the applicant must assign errors. One purpose of this requirement, says the Supreme Court, is to call its attention specifically to the points relied upon for a reversal of the judgment of the Court of Civil Appeals, so as to enable it speedily to determine whether the writ

should be granted; another purpose is to limit, as far as practicable, the questions presented for determination if the writ should be granted, and to relieve the court of the labor of reversing rulings *which have been acquiesced in, or which may not be deemed of sufficient importance to require a revision.*

"In addition to the statutory requirement above noticed, there is a rule of court which declares that each ground of error must be presented separately by an assignment stating clearly and succinctly the error complained of. And the decisions uniformly hold that the Supreme Court has no authority to review a decision of the Court of Civil Appeals except upon the specific assignments contained in the petition for writ of error, *however fundamentally erroneous the decision may be. While the Court of Civil Appeals may reverse a judgment for 'error in law either assigned or apparent upon the face of the record,' the Supreme Court may only grant writ of error for errors specified in the application.*" (3 Tex. Jur., p. 296, § 201.) (All italics ours.)

Of course, if we had concluded to reverse the judgment of the Court of Civil Appeals, we would then have examined the brief and assignments of the defendants in error in that court, to see if any other ground was there presented which would authorize us to uphold the decree of the appellate court, rather than to reverse the case upon the grounds which it had stated. But this is not the case before us. Here we are affirming the judgment of the Court of Civil Appeals, and can consider only the assignments of error presented by the plaintiffs in error, against whom the Court of Civil Appeals reversed the judgment of the trial court.

For the reasons stated, the judgment of the Court of Civil Appeals, reversing that of the District Court, is affirmed.

Opinion delivered November 12, 1936.

Rehearing overruled January 27, 1937.