SOUTHWESTERN PUBLIC SERVICE
COMPANY, Appellant,

v.

Everett E. VANDERBURG et
ux., Appellees.

No. 8978.

Court of Civil Appeals of Texas,
Amarillo.

April 23, 1979.

Rehearing Denied May 21, 1979.

Lemon, Close, Atkinson, Shearer & McCutcheon, Robert D. Lemon, Perryton, for appellant.

Gassaway, Gurley & Sheets, Jody G. Sheets, Borger, for appellees.

REYNOLDS, Justice.

Southwestern Public Service Company seeks reversal of the judgment rendered in its condemnation action to establish an easement for an electrical transmission line over 4.855 acres extending along one side of a section of land. SPS's points-of-error contentions, which lead it to the conclusion that the jury's verdict of $40,000 for the resulting reduction in market value of the remaining 623.965 acres cannot stand, do not present reversible error. Affirmed.

Everett E. Vanderburg and his wife, Louise Collins Vanderburg, own a tract of farmland in Hansford County, Texas, containing approximately 640 acres. The farm is burdened with an 11.18 acre railroad easement extending in a southwesterly to northeasterly direction across the section, and is improved with a brick home and barns situated on fifteen acres in the southeast corner and with an irrigation system. The land is used primarily for the growing of irrigated milo and wheat.

Southwestern Public Service Company brought this condemnation action to secure an easement forty feet wide and one mile long, embracing 4.855 acres, along the west boundary line of the Vanderburg property on which SPS constructed a high voltage electrical transmission line using six two-pole and two three-pole "H-frame" structures. SPS also sought the right of ingress and egress to the condemned strip, but not to the remainder of the farm.

Almost seven years later a jury was empaneled to determine the compensation for the easement taken and the resulting reduction in market value, if any, to the remaining land in the tract. Responding to the special issues submitted, the jury effectively found $1,500 as the value of the easement taken and $40,000 in reduction in market value to the remaining 623.965 acres.

Specifically, the jury found the before-taking value of the 4.855 acre strip to be $1,700 and the after-taking value to be $200. The jury also found that there was a reduction in the market value of the remainder because of the condemnation, and then found the before-taking value of the remainder to be $218,000 and the after-taking value to be $178,000.

Accepting the jury's verdict, the trial court awarded SPS an easement on and a right-of-way to the 4.855 acre strip, and decreed that the Vanderburgs recover $41,700 from SPS plus interest and all costs of court.[1]

Appealing, SPS makes no complaint of the judgment amount for the 4.855 acre easement. Its nine points of error are directed to the $40,000 recovery for reduction in, and to the admission and denial of various items of testimony bearing on, the market value of the remainder of the property.

Appropriate to position the points is a summary of the testimony material to market values adduced at trial.[2] Jim Davis, the Vanderburgs' son-in-law who assists in farming the Vanderburg tract, testified, without assessing a dollar amount, that the market value of the entire section of land decreased because of the presence of the power lines. The reasons he gave for a decrease were difficulty in farming around the poles without causing damage to the farm equipment and hand digging rows among the poles for irrigation, all of which must be done four times a year; difficulty in harvesting with a combine among the poles; fear of an electrical charge in using aluminum irrigation pipe under the power lines; inability to effectively spray with herbicides and pesticides under and around the power lines, with the result that weeds, fertilized from nearby land, grew ten times greater than otherwise and a tremendous weed problem occurred, the crop underneath the line was nearly totally wiped out, and greenbugs reinfested the field; an inability to deep plow among the poles which tends to make the dirt blow; and the prevailing southwest winds blowing weeds and dirt from the easement area across the field, which can damage the crop and could affect the entire field. Furthermore, the presence of the power line poles interrupted plans to place underground pipe for irrigation for half a mile down the west side and, because it was not practical to place the pipe out in the field, the plans to irrigate some seventy to one hundred acres, which had not been irrigated, were abandoned although water was available. Davis acknowledged that the presence of the railroad easement substantially interferes with farming the land as a unit.

Ralph Blodgett, a Hansford County resident, gave testimony of market values. Blodgett, who operates an agri-related business with close personal contacts with farmers and land, owns some irrigated farms, and has leased others, in Hansford and Ochiltree Counties. He bought two farms, one irrigated and one dry land, in the vicinity of the Vanderburg property during the time this condemnation action was being pursued. He thought he was familiar with, and he attempts to keep up with, market values of land in this area. He declared he was familiar with market values of land in the vicinity of the Vanderburg section at the time of the condemnation. He has been on, has inspected, and was acquainted with the Vanderburg property which, in his opinion, was farmed to its best use as a unit.

1. The amount of the judgment, being fixed at $200 more than the jury's verdict, apparently was calculated without credit for the after-taking market value of the easement strip; but, as noted, Southwestern Public Service Company makes no complaint in this regard.

2. For health reasons and upon his doctor's recommendation, Everett E. Vanderburg did not attend the trial.

Blodgett had an opinion as to the market value of the Vanderburg section both before and after the taking of the easement. In his opinion, the section would be worth $400 an acre without the railroad and, with the railroad, the before-taking value of the land was $350 an acre. After taking, the 4.855 easement strip was reduced in value by seventy (70%) percent, which he figured as $1,189.48 in damages; and the remaining 623.965 acres were damaged thirty (30%) percent, which he calculated to equal $65,-516.32 in damages.

Questioned as to the basis for his opinions, Blodgett enumerated the matters he had taken into consideration. He listed an intrusion upon one's privacy for a permanent easement, the unsightly appearance of the power line structures, and the deprivation of construction sites where the power line existed. He said that the double-pole structure is very difficult to farm around, posing a danger, if not destruction, to high priced farm equipment; the land is impossible to deep break and is almost impossible to irrigate through the structures; the structures pose a danger to aerial spraying and present a weed and Johnson grass problem; and the prevailing southwest winds blowing across the easement to the rest of the section pose a problem of the cross-pollination of Johnson grass with other grain sorghums in the area.

However, Blodgett knew of no specific instance where a tract of land sold for less than its market value or was rented for less because of the presence of a power line. Neither did he know of a single instance where a taxing agency had given a tract of land a lesser valuation than it otherwise would because of the presence of a power line of any type.

Bill C. Moore, an Amarillo licensed real estate broker and appraiser who spent some ninety percent of his time doing appraisal work for clients, gave opinion testimony of market values. The basis for his opinions was the comparative market data approach, consisting of analyses of comparable sales of farmland similar to and in the general area of the Vanderburg property, together with his inspection of the Vanderburg property on three or four occasions. Some of the comparable sales involved land with power lines and land without power lines.

It was Moore's opinion that the Vanderburg section was worth $300,000, computed at $350 per acre with an additional $81,000 for the improvements. His opinion was that the 4.855 acre easement had a before-taking market value of $1,700 and an after-taking market value of $200. It was his further opinion that the remaining land was not affected by, and did not decrease in market value because of, the power line easement. He knew of no instance where the market value of the remainder of a tract of land was affected or reduced by the construction of power lines along one side of the property.

■ Initially, SPS challenges the admission of the testimony of Ralph Blodgett, insisting that it was incompetent and inadmissible, and that without it there was no evidence to raise a fact issue as to a reduction in value of the remainder of the Vanderburg property.[3] SPS argues that Blodgett's testimony was nothing more than naked conclusions, speculative and conjectural in nature. The responses of "I think so" and "I attempt to" Blodgett made to questions on direct examination inquiring of his familiarity and whether he keeps up with market values of land in the area are pointed to by SPS as indicative of his lack of knowledge about market values so as to render him unqualified to testify. To further evidence his lack of qualification, SPS notes Blodgett's admission on cross-examination that he knew of no instance when a piece of land sold at less than market value, or was rented for less, or had a lower tax valuation because of the presence of power lines on the land.

---

**3.** Southwestern Public Service Company also asserts there was insufficient evidence to raise a fact issue regarding the value reduction of the remainder. Such a contention can only be treated as a "no evidence" point. *Mobil Pipe-* *line Company v. Goodwin*, 492 S.W.2d 608, 611 (Tex.Civ.App.—Houston [1st Dist.] 1972, writ ref'd n. r. e.). Accordingly, the assertion is treated as a "no evidence" point.

Whether a witness is qualified to testify regarding market value of property is largely within the sound discretion of the trial court, *Urban Renewal Agency of City of San Antonio v. Abdo*, 562 S.W.2d 872, 875 (Tex.Civ.App.—San Antonio 1978, writ ref'd n. r. e.), and there is no abuse of discretion in admitting the testimony if the witness's qualifications meet the legal test. *MAPCO, Inc. v. Farrington*, 476 S.W.2d 50, 55 (Tex.Civ.App.—Amarillo 1971, writ ref'd n. r. e.). Generally, a witness will be qualified to give his opinion about market value if he has knowledge of the value standards of the class of property to which the subject property belongs. In this regard, the witness must have a knowledge of market value in the vicinity of the subject property based at least in part on personal observation and not solely on hearsay, and, additionally, he must have a knowledge of the particular property to be valued. *State v. Sides*, 348 S.W.2d 446, 450 (Tex.Civ.App.—Dallas 1961, writ ref'd n. r. e.). A statement by the witness that he knows the land in question and is acquainted with the market value is sufficient to authorize the reception of his valuation testimony. *Urban Renewal Agency of City of San Antonio v. Abdo, supra,* at 875.

Measuring Blodgett's testimonial qualifications by the principles just expressed, we cannot say the trial court abused its discretion in admitting Blodgett's testimony. He testified that he was familiar with the market value of land in the vicinity of the Vanderburg section, and that he had a knowledge of the property itself. The two responses by Blodgett that he "thinks" he is familiar with market values and that he "attempts" to keep up with market values in the area are not, contrary to SPS's insistence, evidence of lack of fitness to testify; instead, they are, at most, minor defects in Blodgett's qualification to testify, and they affect the weight to be given his testimony rather than its admissibility. *Grayce Oil Co. v. Peterson*, 128 Tex. 550, 98 S.W.2d 781, 783 (1936). *See, also, MAPCO, Inc. v. Jenkins*, 476 S.W.2d 55, 63 (Tex.Civ.App.—Amarillo 1971, writ ref'd n. r. e.). Similarly, Blodgett's inability on cross-examination to relate an instance when the presence of power lines caused a piece of land to be sold below market value, or to be rented for less, or to have a lower tax valuation, also goes to the weight of Blodgett's testimony, but does not bar its admissibility. *State v. Sides, supra,* at 452.

Thus, the trial court's determination that Blodgett was qualified to testify and that his testimony of market values was admissible must be upheld. The testimony of Blodgett, conflicting with that of Moore, constitutes some evidence of a reduction in the market value to the remainder. As a consequence, the trial court was required to submit the reduction-in-value issues to the jury, Tex.R.Civ.P. 277, particularly because the question of a reduction in market value of the remainder as raised by the conflicting opinion testimony is peculiarly one for the fact finding body. *Texas Pipe Line Co. v. Hunt*, 149 Tex. 33, 228 S.W.2d 151, 156 (1950).

Given some evidence of probative force to support the jury's findings, SPS next submits that the jury's verdict of a $40,000 reduction in market value to the remainder is so against the great weight of the testimony as to be manifestly unfair and unjust and is clearly excessive. The immediate thrust of SPS's argument is that Moore's testimony, which is that there was no reduction in market value of the remainder, so far outweighs Blodgett's testimony to the contrary that the verdict cannot stand.

The ultimate inquiry, then, is the reasonableness or excessiveness of the verdict within the limits of the testimony. That testimony consisted not only of the opinions of Moore and Blodgett as to values, but the reasons they, together with Davis, gave as predicates to justify the opinions of values.

In matters of the value and depreciation in value, if any, of the land in question, it is proper to admit evidence of the opinions of witnesses acquainted with the market values of the land, and the weight of any one opinion will depend in a great measure upon the witness's knowledge of values and the facts he states for his opin-

ion. *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 194, 200, *reh. denied,* 126 Tex. 604, 89 S.W.2d 979 (1936). Because all opinion of depreciated market value is, at best, something of a speculation, *Texas Pipe Line Co. v. Hunt, supra,* at 156, any fact which may reasonably affect the value of the land which remains after the taking of the easement is proper for the jury's consideration. *State v. Carpenter, supra,* at 197–98.

 Conformably, the jury, in determining whether there was a reduction in market value of the remainder, was entitled to consider, with other testimonial facts, the testimony that the power line: is unsightly, *Texas Power & Light Co. v. Jones,* 293 S.W. 885, 886–87 (Tex.Civ.App.—Dallas 1927, writ ref'd); produces inconvenience in cultivation, *Hall v. Wilbarger County,* 37 S.W.2d 1041, 1047 (Tex.Civ.App.—Amarillo 1931), *aff'd on another ground, sub nom. Wilbarger County v. Hall,* 55 S.W.2d 797 (Tex. Comm'n App.1932), as well as difficulty in farming the land as one unit around power poles where weeds would grow, *Southwestern Public Service Co. v. Goodwine,* 228 S.W.2d 925, 928–29 (Tex.Civ.App.—Amarillo 1949, writ ref'd n. r. e.); causes a weed hazard with Johnson grass growing there and blowing over the farm, results in a potential for wrecking farm machinery around poles, interferes with crop spraying by airplane with poorer crop results, and poses a danger of electrocution. *Texas Electric Service Company v. Etheredge,* 324 S.W.2d 322, 323 (Tex.Civ.App.—Eastland 1959, no writ); *Texas Electric Service Company v. Merket,* 300 S.W.2d 167, 169–70 (Tex.Civ.App.—Eastland 1957, no writ). The specific elements testified to as resulting from the easement taking and relating to and tending to affect the market value were admissible, not as the measure of damages, but as elements to enable to jury to arrive at the correct market value. *MAPCO, Inc. v. Holt,* 476 S.W.2d 64, 69 (Tex.Civ.App.—Amarillo 1971, writ ref'd n. r. e.).

 The object of the conflicting evidence adduced on trial was to place before the jury all the facts essential to a just decision of the merits of the controversy so that the rights of the parties may be justly determined. *See State v. Carpenter, supra,* at 200. The jurors in weighing the opinion testimony and reaching their verdict may— and, as some authorities state, to act intelligently must—give effect to the testimony by applying to it, and considering it in the light of, their own general knowledge and experience on the subject of the inquiry. *Simmonds v. St. Louis B. & M. Ry. Co.,* 127 Tex. 23, 91 S.W.2d 332, 335 (1936). The jury, presumably qualified to be fair and impartial and representing a cross-section of the conscious of the community, was in the best position to determine from all of the evidence the proper verdict. Having returned a verdict that is well within the limits of the values testified to by the witnesses, the jury's findings are binding, *City of Fort Worth v. Estes,* 279 S.W.2d 687, 688 (Tex.Civ.App.—Fort Worth 1955, writ ref'd n. r. e.), and we are not in the position to say the findings are against the great weight of the testimony.

Notwithstanding a verdict well within the limits of the testimony of values, SPS offers the testimony of Glenn Roy given on the hearing of its motion for new trial to demonstrate that the verdict still is excessive. Roy, who is in charge of acquiring SPS's right-of-way for transmission lines, testified in essence that the $40,000 award for damages to the remainder stands alone in its excessiveness and that the Vanderburgs offered to settle for $8,600 shortly before the cause went to trial.

 Aside from the fact that Roy's testimony was centered on the costs of acquiring various rights-of-way, the admissible portion of his testimony was not offered for the jury's consideration. In passing on SPS's complaint of excessiveness, we are limited to the evidence the jury heard and considered to reach its verdict, and we may not second-guess the jury on the basis of evidence not presented for its consideration. *Compare Kerwin v. Mead,* 229 S.W. 677, 678 (Tex.Civ.App.—El Paso 1921), *rev'd,* 241 S.W. 119 (Tex.Comm'n App.1922, holding approved). *Cf., also, United States Fidelity*

*& G. Co. v. Bimco Iron & M. Corp.,* 455 S.W.2d 828, 831 (Tex.Civ.App.—Houston [1st Dist.] 1970, *aff'd,* 464 S.W.2d 353 (Tex. 1971), (holding that testimony introduced in a bill of exception hearing cannot be considered by the court in determining the sufficiency of the evidence to support the answers the jury made to the issues submitted.)

The state of the evidence we review is different from that in *Roberts v. State,* 350 S.W.2d 388 (Tex.Civ.App.—Dallas 1961, no writ), upon which SPS relies, where one of the jury's findings of value was far greater than the value given by any witness. Here, the jury reached a verdict on findings of value well within the limits of the testimony before it, and we cannot substitute our opinion of values for those the jury found were the most reasonable under the evidence, *Trinity River Authority of Texas v. Barrett,* 497 S.W.2d 91, 96 (Tex. Civ.App.—Houston [1st Dist.] 1973, no writ), particularly where, as here, there was competent evidence to support the jury's verdict. *Tennessee Gas Transmission Co. v. Dishman,* 303 S.W.2d 471, 484 (Tex.Civ.App. —Beaumont 1957, writ ref'd n. r. e.).

Lastly, SPS urges reversible error in the trial court's refusal to admit the testimony of Dorsey Schad, a farmer, on the basis of a violation of Tex.R.Civ.P. 267.[4] The rule was invoked by Vanderburgs' counsel before the receipt of any testimony. Bill C. Moore, who was present, was sworn and placed under the restrictions of the rule. Schad had not been called as a witness, was not present in the court room and, consequently, he was not "placed under the rule."

On the morning of the second day of the trial, Moore was requested by SPS's attorneys to talk with Schad at 4 p. m. that day. The purpose of the conversation was to confirm Schad's purchases and sales of land and to determine whether Moore would use them as comparable sales in his testimony. An hour or two before Moore and Schad were to meet, SPS's attorneys applied for a subpoena for the appearance of Schad as a witness on behalf of SPS.

Shortly after Moore arrived at Schad's home and they had begun a discussion of Schad's involvement in land purchases, one of SPS's attorneys notified Schad by telephone that the subpoena would be served. Their conversation continued and, some twenty or thirty minutes before its end, the subpoena was served on Schad. During the conversation, Moore quizzed Schad in explicit detail about the nature of the land sales, the presence of H-frame structures, and whether and how the easement affected the price for the land. Both Moore and Schad said that they did not discuss any testimony either might give.

When Schad's testimony, the primary thrust of which was his opinion that the power line easement would not affect the remainder of the property, was tendered the following day to rebut the valuation testimony of Blodgett, it was refused upon the Vanderburgs' objection that the rule had been violated.[5] Schad's testimony, which also included his opinion that the railroad easement would be a lot worse than the power line easement, was then offered for the limited purpose of comparing how the tract was affected by a railroad

---

4. Tex.R.Civ.P. 267 provides in part: "At the request of either party, in a civil case, the witnesses on both sides may be sworn and removed out of the court room to some place where they can not hear the testimony as delivered by any other witness in the cause. . . Witnesses, when placed under the rule, shall be instructed by the court that they are not to converse with each other or with any other person about the case other than the attorneys in the case, except by permission of the court, and that they are not to read any report of or any comment upon the testimony in the case while under the rule."

5. Technically, a prospective witness who has not been placed under the rule cannot, by the very terms of the rule, violate it; but, once the rule is invoked, its purpose can be evaded by a prospective witness who has not been placed under the rule. Nevertheless, the rule may extend to either a violator or an evader. *See Southwestern Bell Telephone Company v. Johnson,* 389 S.W.2d 645 (Tex.1965), for the holding that the court has discretionary authority in a proper setting after the rule has been invoked to exclude the testimony of one who has not been placed under the rule.

right-of-way versus a power line easement. This offer also was refused.

When passing on the refusal of a trial court to allow testimony after Rule 267 has been invoked and the proffered witness has not been placed under it, the question is not whether the action of the court was required, but whether the court abused its discretion. An abuse of discretion is not shown by the fact that the excluded testimony is vital to one party's cause, *Southwestern Bell Telephone Company v. Johnson*, 389 S.W.2d 645, 647–48 (Tex. 1965), nor by the fact that the trial court decided a matter within its discretion in a manner different than the appellate court would have decided it. *Jones v. Strayhorn*, 159 Tex. 421, 321 S.W.2d 290, 295 (1959). In reviewing the issue, the appellate court may not substitute its own judgment for that exercised by the trial court, but must decide only whether the trial court's decision was arbitrary or unreasonable. *Landry v. Travelers Insurance Company*, 458 S.W.2d 649, 651 (Tex.1970).

Within these principles and under the circumstances of this cause, we cannot say the trial court acted arbitrarily or unreasonably in refusing to receive the testimony of Schad. The exclusion of the testimony for either the primary or limited purpose for which it was tendered rests upon the same ground. *Southwestern Bell Telephone Company v. Johnson, supra,* at 648. It was within the discretionary authority of the trial court to consider all of the facts, including the facts that the circumstances calling for the exclusion of Schad's testimony were controlled by SPS and that, in the main, the excluded testimony was merely cumulative in nature to that given by Moore. Accordingly, we are not prepared to say that the trial court abused its discretion.

SPS has not presented reversible error by any point of error. All points are overruled.

The judgment of the trial court is affirmed.